UNITED STATES, Appellee

v.

THOMAS H. JACKSON, Private First Class, and JOHNNIE F. BURNS, Private E–2, U. S. Army, Appellants

6 USCMA 193, 19 CMR 319

194

*First Lieutenant Joseph B. Axelman* argued the cause for Appellants, Accused. With him on the brief was *Lieutenant Colonel Joseph L. Chalk.*

*First Lieutenant William G. Fowler* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Both accused were charged with murder. Burns pleaded guilty to involuntary manslaughter and Jackson entered a plea of not guilty. Both were convicted of murder and sentenced to confinement at hard labor for life. The convictions have been affirmed by a board of review.

At about 9:15 p.m. on a dark, foggy night in November 1953, Wilhelm Brueckmann and his fiancee, Irmgard Naegele, left the Wiesbaden Canoe Club. Their way took them through the Schlosspark. As they proceeded along one of the park paths, two American soldiers passed from the opposite direction. One of the soldiers asked, "Wie geht's" (how are you), but they made no reply. After they had passed, the soldiers stopped and continued to call after them, "Wie geht's." They noticed one of the soldiers "stooped over" and, fearing that he intended to throw something, they quickened their pace. The soldiers followed them. Brueckmann told Miss Naegele to run. She did and he followed behind her. The soldiers "also started to run."

Brueckmann dropped behind his girl friend. When she reached the exit about 150 meters away, she heard him call for help. She waited. "Immedi-

ately thereafter" he appeared and said, "Quick, a doctor! They stabbed me in the belly." Brueckmann was taken to the hospital. Examination showed three wounds—one below the tip of the right shoulder blade, a second on the upper left arm, "a hand's width" below the shoulder joint, and the third, five centimeters above the navel. The abdominal wound required a surgical operation. A month later Brueckmann died of "paralysis of the intestines" and consequent blood poisoning which developed in the course of treatment for the abdominal wounds. The doctor who treated Brueckmann at the hospital, testified that it was reasonably certain medically that each of the wounds was caused by a sharp instrument such as a knife.

About a half hour after the incident in the park, the accused were seen by a Private Ruger at the Casino Club. As he frequently did Ruger started "playing" ("rassling around, boxing and sparring") with the accused, Jackson. Burns thereupon "stuck" a knife into Ruger's side and he released Jackson. Ruger noticed some stains on the knife. Although Ruger said nothing about it, Burns volunteered that the stains were blood and that he had "cut a German" when he was in the park. Jackson

196

remarked that he was with Burns at the time but he "was running behind Burns and the German and at the time, he dropped his hat and stopped to pick it up."

On December 8, 1953, Jackson was interviewed by an agent of the Office of Special Investigations, United States Air Force. Advised of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, and that he was suspected of complicity in the Brueckmann incident, he willingly gave an account of his conduct throughout the day, including the events of the night. The next day he was again interviewed and voluntarily gave a second statement to "clear up" some matters in the original. These statements were admitted in evidence as prosecution exhibits. The substance of the combined statements is as follows: During the afternoon, he played cards in the day room with Burns. He saw Burns, "fooling around" with his switchblade knife. Jackson had seen Burns in possession of the knife on several previous occasions. About 5:30 p.m., he and Burns left the Kaserne and went to the Rhinegold Casino where they stayed for a short time. Leaving the Casino, they went to a nearby sidewalk stand where they purchased a bottle of wine and then proceeded to the Schlosspark. For several hours they wandered through the park. From time to time they drank from the wine bottle.

At one point, on Burns' insistence, they followed a girl out of the park to a nearby railway crossing. They did not, however, accost her. At the crossing, Jackson remarked, "Come on, let's go back." Burns however, hailed an army bus and inquired as to whether the driver would take them to some town. The driver replied in the negative and drove off. Jackson and Burns then retraced their way to the park.

Back in the park, the accused continued to walk and to drink until the wine bottle was empty. In their meanderings, they passed a number of Germans whom they greeted with "Wie geht's." Their greetings were returned. Then they passed the couple who did not respond. As they passed, Jackson "heard the . . . man say something in German which I did not understand." What happened immediately thereafter is described by him as follows:

". . . I got the feeling, and BURNS did too, that this German called us a name. Upon hearing this, BURNS and I stopped and turned around. The German girl and the man continued walking. We started walking behind them in a distance of about fifteen (15) feet. The German couple started to run and BURNS and I started to run after them. No one said anything at this time. . . . We started to run both of us at the same time, for we both wanted to probably catch up with these people and find out why they did not speak to us. Because they ran, it indicated to me that he called us some sort of name and I think, BURNS had the same feeling."

After running some distance, the German stopped and turned around. Jackson was following "pretty close" behind and ran into him. The German swung his fist. Jackson ducked, and the blow knocked off his hat. Jackson stopped to pick it up. As Jackson looked for his hat, Burns went by following the German down the path. It was "very dark" and Jackson could "just see" that they were close together. The German "hollered" as "if he was hurt." "Moments later" Burns appeared with his knife in his hand. He said "Come on, let's go, I think I cut him." Both of them ran out of the park. They returned to the Casino, where they met Ruger, and Burns told Ruger that he had "cut a guy."

A few minutes later civilian and military policemen arrived at the Casino. When the police left, the accused decided to hide their knives. It may be noted here that Jackson also had a knife in his possession. It had a two and three-quarter inch blade which was of a legal length, but Jackson did not know it at the time. The accused dug a hole behind the fence outside the Casino and buried their knives. Shortly thereafter, Jackson ad-

vised Burns that he had changed the location of their hiding place. The next day Burns recovered the knives and returned Jackson's to him. He told Jackson that he had discovered some blood on his coat.

The prosecution also introduced evidence to the effect that on December 5, ten days after the incident, Jackson brought his field coat to the tailor for dry cleaning. The clerk noticed some dark red stains across the front of the coat. She called Jackson's attention to them, and asked whether they were blood or paint. He told her to note down what she thought it was. On closer examination and testing, she determined that the stains were blood. Jackson countered this evidence by showing that on November 30, he had attempted to help a girl who had badly cut her fingers with a knife. The girl testified to the occurrence as did another bystander who had himself been splattered with blood in a like attempt. A girl friend was also splattered with blood in seeking to help.

Jackson testified in his own behalf. His recital of the details of the tragic encounter is substantially the same as that in his pretrial statements. Although he admitted he had a knife in his possession at the time, he insisted he did not remove it from his pocket. On cross-examination, he conceded it was "perfectly obvious" that when Brueckmann started to run he had no desire to talk to the accused.

In some particulars, Jackson's testimony is contradictory and evasive. Thus, in his direct testimony, he said that when he ran after Brueckmann and the girl to find out what had been said, he accidentally ran into Brueckmann because he was "running too fast" and was "too close up" to him to stop. Later, he maintained he "wasn't running too fast," rather he "was trotting like," and he was somewhat impeded by his field coat. Also, when asked what it meant to him when Burns told him that he thought he had cut the German, he replied, "I don't know, sir." He gave the same kind of answer when asked how he expected to learn what Brueckmann said, when he

himself could speak no German; and he made the same reply when asked who dug the hole to hide the knives.

Other testimony about the incident came from Burns. Like Jackson, he was questioned by an Office of Special Investigations agent on December 8. He was informed by the agent that he was a suspect in connection with the assault in the park and the provisions of Article 31, Uniform Code of Military Justice, were read to him. In addition, at the end of the reading, he was told, "in other words, you don't have to answer any of my questions." Burns replied that he understood his rights and that he had had the Article explained to him a number of times. At the outset, Burns refused to make a statement. Later, however, he said that he was going "to tell . . . the whole truth" and he made an oral statement.

Counsel for Burns objected to the admission of the statement on the grounds that there was no adequate showing that Burns had an intelligent understanding of Article 31 in that he did not know that an oral statement could be used against him, and, secondly, that he was not properly advised of the offense of which he was suspected. Burns testified for the limited purpose of supporting the objection. He admitted that Article 31 was read to him at least four times and that he was advised that "this was a case of assault." It should be noted that, at the time Brueckmann was in the hospital apparently recuperating from his wounds, Burns admitted he was asked if he understood his rights under the Article and he replied that he did. He construed the Article to mean that he didn't "have to say nothing that would mess me up." He thought, however, that a statement meant only a writing. He refused to give any statement because he was scared and he didn't know what he was doing. At first he declined to answer all questions relating to the incident. But on continuation of the questioning, he made a statement.

Defense objections were overruled and Burns' pretrial statement was ad-

mitted in evidence. In it Burns related his activities preceding the walk in the park. He then told of the meeting with Brueckmann and the girl. The substance of that part of Burns' statement is as follows:

". . . Toward the middle of the park they met a man and girl and Burns or Jackson stated—or spoke— 'Wie geht's'?' or some other salutory (sic) remark. Burns stated that the man replied in what he thought was a derogatory manner; he wasn't sure what the man said. They walked past, turned, and started walking back toward the couple. When the man observed that they were following him the couple started running. Jackson started running after the man and the man—and Burns saw the man knock Jackson down and knock his hat off. Burns at that time started running after the man, pulled his knife from his pocket, and ran up to the man and was hit in the mouth. Burns then swung; according to his statement he swung at the man, cutting him in the shoulder. The man swung at Burns again and Burns hit him in the stomach with the open knife. He and Jackson then returned to the Rhinegold Casino. At the conclusion of that we asked Burns what he had done with his knife. He told us first that he had thrown it in the Rhine river, then he told us he had buried the knife, and then he told us he had put it in an ash can on the same evening. We asked him if he was willing to take a lie detector examination on the disposition of the knife and he stated that he would."

Three days after his oral statement Burns voluntarily gave a written statement to an Office of Special Investigations agent. "Most" of the words and thoughts were his own. This statement was admitted as a defense exhibit. Here, too, Burns recounted the details of his and Jackson's conduct in the park. This statement is substantially the same as the earlier oral one, except that Burns now said that he first took out his knife after he was hit by Brueckmann. When he was hit a second time, he "started the knife in to his shoulder."

He quickly drew the knife away not knowing the man was cut, "then as the man drew his right hand to strike me, I then cut at him I felt the knife go in. Then the man hollered, which frighting [sic] me and I with drew my knife a turn to run from the man. And as I started to run I met Jackson and told him to come on."

Burns also testified at the trial. His testimony coincided generally with the written pretrial statement. He added, however, that when he and Jackson left the Casino, his head was "twisted," that is, he was feeling high. After they had finished the bottle of wine in the park, his head was "smoking." In the main, he could recall the events fairly well but the meeting with Brueckmann and the girl happened "so fast" that he did not remember too much. He and Jackson turned around after the couple had passed. Jackson did not say anything to him. He stood still. Jackson, however, walked and then ran after the man. He then walked after Jackson. When Jackson reached the man, he saw him "get knocked down." The man turned and ran. Whereupon he ran over "to see had the man gone for sure." Shortly thereafter he was hit in the mouth. He staggered back and as he did so he took out his knife and opened it. When he was hit a "couple of times" he "shut . . . [his] eyes and threw . . . [his] hand at him to hit him." The man hollered "Oh," turned, and ran away. Burns ran in the opposite direction toward Jackson, who was about ten feet away. Jackson was then standing up. He said to Jackson, "Let's go, I think I cut him." He did not actually know that he had done so until he saw blood on the knife when he looked at it in the Casino. He and Jackson buried their knives because they had learned that a shakedown was being conducted at the Kaserne gate for incoming personnel.

On cross-examination, Burns denied telling the Office of Special Investigations agent that he had taken out his knife when he first started after Brueckmann. He could not account for the wound in Brueckmann's back, but was "quite sure" that he swung with his knife more than once. He

did not see whether Jackson had a knife in his hand at any time during the encounter. Like Jackson, he did not know who dug the hole to bury the knives nor did he know why he later changed the hiding place.

The evidentiary picture was completed with the introduction of reputation testimony regarding the accused. Four witnesses, including the battery commander, testified on the subject. All stated that Burns' reputation for truth and veracity was poor, and none would believe him under oath. As for Jackson, the battery commander and the battery first sergeant stated that he was a good soldier, and they believed generally in his truthfulness.

At the beginning of the case, trial counsel read to the court an excerpt from the Manual for Courts-Martial on the law of aider and abettor. He made an opening statement in which he said that the prosecution would establish the meeting in the park and that when Jackson overtook Brueckmann a "short struggle" ensued. Then Brueckmann broke loose, but since he had momentarily been delayed by Jackson, Burns was able to overtake him, and "Burns inflicted three injuries on Brueckmann." Trial counsel concluded by saying:

". . . Now, may I be perfectly frank with you? I do not contend, nor will the evidence show, that Jackson held the knife. Burns held the knife. But the evidence will establish and it is our contention that the two of them engaged in an enterprise so dangerous that they became principals, and because they were acting jointly and in pursuance of a common design Jackson as well as Burns should be held responsible for the acts."

Again in arguing against a motion for a finding of not guilty, as to Jackson, the trial counsel said:

"If the court please, briefly, I told you at the outset of this case that the prosecution's evidence would not show that Jackson's hand wielded the knife but it would show that because Jackson had participated in this assault and battery that Burns was able to overtake the German again and assault him with a knife, cut him, and from that wound he died. How was it that Burns overtook him? Why was it? The German was running away, trying to run away, and how was he overtaken? By Burns. And why was he overtaken by Burns? Because Jackson had run after him first and tackled him. . . ."

In his closing statement, however, trial counsel changed his theory. He still contended that Jackson was being prosecuted as an aider and abettor, but he then maintained that not only did Jackson tackle Brueckmann so as to enable Burns to overtake him, but "there is in evidence no single explanation of this third wound in the middle of the back. . . . Who did that? I don't know, but Jackson had a knife and Jackson buried his knife after it happened and Jackson fled . . . and he never told anybody until the OSI got a hold of him on the 8th of December . . . . and I say to you that Jackson is just as much a murderer as Burns."

At the close of the case, the law officer gave his instructions. Following advice on the elements of the offense the law officer turned to a consideration of Jackson's responsibility for the crime charged. In part, he said:

". . . As I have mentioned previously, it appears from the evidence . . . that the theory of the prosecution is that the actual wielder of the knife involved was Private Burns, and that Private First Class Jackson is an aider and abettor and hence liable as a principal. [This earlier advice was given in connection with the law officer's ruling on Jackson's motion for a finding of not guilty. The law officer then stated the requirements of proof regarding establishment of an aider and abettor status.] . . . If there is a concert of purpose to do a given act—in this case the evidence indicates the act to be to assault the victim, Wilhelm Brueckmann—and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned, but in order to make one liable as a principal in such a case the offense committed must be embraced

by the common venture or it must be an offense likely to result as a natural and probable consequence of the offense directly intended. Consequently, if you are satisfied by legal and competent evidence beyond a reasonable doubt that Private First Class Thomas H Jackson aided or abetted the commission of the offense with which both he and Private Johnnie F Burns are charged, you should find him guilty even though he was not the active perpetrator of the offense. By 'he' I mean Private First Class Thomas H Jackson. As I have previously instructed you, one who accompanies another to aid and assist him in assaulting a third cannot escape liability for homicide if his companion kills the victim by the use of a deadly weapon on the theory that he did not know of the intended use of the weapon or did not consent thereto."

Continuing his instructions the law officer delineated a number of principles of law raised by the evidence, such as the effect of intoxication, character evidence, and self-defense. He then adverted to Burns' plea of guilty to involuntary manslaughter. He said that "In view of the fact that" Burns had pleaded guilty to that offense he would recite its elements.

No objection was made by either accused to the instructions given. Except for one request not material to the issues on this appeal, neither accused requested additional instructions.

Our first problem is whether the evidence is sufficient to support Jackson's conviction for murder. If Jackson also stabbed Brueckmann his guilt would be plain. Three stab wounds were inflicted. Although Jackson admitted he had a knife in his possession, he emphatically denied that he removed it from his pocket. On the other hand, in his two pretrial statements, Burns said he stabbed Brueckmann twice, once in the shoulder and once in the stomach. At the trial, he testified that when he was hit by Brueckmann, he "shut" his eyes and lashed out with his knife. It is, therefore, unfortunate that the nature of the three wounds was not determined in greater detail. Had it

been, it might have been shown by competent evidence that the injuries were or were not produced by different instruments. Such evidence either would have provided corroboration of Jackson's denial of using a knife or established a solid basis for inferring that he also stabbed Brueckmann. Brown v. State, 146 Tex Crim 602, 177 SW2d 64. We must, however, take the record as it comes to us.

Plainly, the case was submitted to the court-martial on the theory that Burns alone used a knife. True, trial counsel changed his position on that point. In his opening statement, he represented that he would be "perfectly frank" with the court and he would not contend nor would the evidence show that Jackson held the knife. He reiterated this view in his argument opposing the motion of the finding of not guilty. In summation, however, he argued, in effect, that Jackson had probably inflicted one of the three wounds. Notwithstanding trial counsel's turnabout, under the law officer's instructions, the court-martial was not permitted to determine Jackson's guilt on the basis that he also stabbed Brueckmann. Thus, the law officer emphasized that "it appears from the evidence in this case that the theory of the prosecution is that the actual wielder of the knife involved was Private Burns and that Private First Class Jackson is an aider and abettor and hence liable as a principal." Consequently, we need not consider the merits of the Government's contention that the court-martial could have found that Jackson actually used his knife at the initial point of the assault. Cf. United States v. Blevens, 5 USCMA 480, 18 CMR 104.

The law of aider and abettor is not a dragnet theory of complicity. Mere inactive presence at the █ scene of the crime does not establish guilt. United States v. Williams, 341 US 58, 95 L ed 747, 71 S Ct 595. Neither does later approval of the act supply a ground for conviction. True v. Commonwealth, 90 Ky 651, 14 SW 684; Harper v. State, 83 Miss 402, 35 So 572. The law requires concert of purpose or the aiding or encouraging of the perpetrator of the

offense and a conscious sharing of his criminal intent. Manual for Courts-Martial, United States, 1951, paragraph 156, page 302. Pereira v. United States, 347 US 1; United States v. Jacobs, 1 USCMA 209, 2 CMR 115.

Counsel for Jackson concede that under one view of the evidence Jackson tried to assault Brueckmann. They contend, however, that "Jackson's intention was to do nothing worse to the German than assault him with his fists." They maintain, therefore, that he is not responsible for the independent act of Burns. See People v. Zammora, 66 Cal App2d 166, 152 P2d 180; Mills v. State, 24 Ga App 68, 100 SE 32; Woolweaver v. State, 50 Ohio 277, 34 NE 352. The substance of their argument is summarized briefly in Bishop, Criminal Law, 9th ed, § 637(5), pages 463–464, as follows:

"Where two combine to fight a third with fists, if death accidentally results from a blow inflicted by one, the other also is answerable for the homicide. But if the one resorts to a deadly weapon without the other's knowledge or consent, he only is thus liable."

We think that the evidence shows more than an agreement of that limited nature.

Jackson and Burns deny having a specific agreement on any plan or purpose in running after Brueckmann and Miss Naegele. However, neither were sure of what they supposed Brueckmann said; yet each concluded that it was derogatory. Each turned around and started after the couple, first walking, and then running. From these circumstances the court-martial could reasonably infer that the accused had some sort of agreement as to what they proposed to do. In fact, in his first pretrial statement Jackson virtually admitted that an understanding existed between himself and Burns when he said that he "got a feeling, and BURNS did too, that this German called us a name." For Jackson to know that Burns had the same feeling as he, there necessarily had to be some sort of communication of ideas. From the fact that each acted in the same way in response to that feeling, it can be inferred that they had an agreement of purpose. But what was that purpose?

According to Jackson, he and Burns wanted to find out only what Brueckmann had said. By itself that desire imports a harmless purpose. But when considered in the context of the evidence, we think that the court-martial could reasonably infer a predetermined criminal design to inflict harm.

When Brueckmann and Miss Naegele started to run, it "indicated" to Jackson that Brueckmann's remark had been "some sort of name." Burns also admitted in his pretrial statement that he thought the victim's remark was derogatory. Both were armed with a knife. Both had been drinking; Burns to the point where his head was "smoking." Both believed that they had been insulted. Although the decedent and the girl were afraid of them and sought to leave the area by running away, both accused chased after them. The accused could expect only violence as a consequence of their conduct. Certainly, Burns was prepared for the use of force. In his oral pretrial statement, he admitted that he pulled his knife from his pocket as he ran up to Brueckmann.

Jackson denied resorting to his own weapon but he knew Burns had a knife of illegal length and that he frequently "fooled" with the knife openly. Moreover, he professed no dismay or surprise that Burns had cut Brueckmann. It would not be unreasonable to conclude therefrom that Jackson had expected Burns to use a knife if the need arose. The legal effect of these facts was commented upon by the Supreme Court of Kentucky in Combs v. Commonwealth, 224 Ky 653, 6 SW2d 1082. The court there pointed out that participation in a fight by one who knows his associate and ally is armed and likely to kill constitutes evidence of aiding and abetting sufficient to justify submitting the case to the jury.

From an objective point of view, Jackson could have expected nothing but violence from his conduct. The night was dark and foggy. The place was practically deserted. He and Burns were foreign soldiers. They

were acting in a boisterous manner. Suddenly, they confronted a man and woman. They addressed them but received no friendly response. In fact, the couple sought to run from them. Instead of letting them go, the accused chose to run after them. Under these circumstances it could not be expected that Brueckmann would stop and tamely inquire as to why he and his fiancee were being pursued. In fact, he did exactly what a reasonable person would do in a like situation; he told his fiancee to run ahead to safety while he tried to delay the attackers. Violent resistance by Brueckmann was virtually inevitable. And when it came, what course would it naturally follow? Both accused were armed with knives; both were aggressive; and Jackson knew that Burns had a predisposition to "fool" with his knife. A homicide resulting from an assault under such circumstances is sufficient to support a conviction for murder. Gibson v. State, 89 Ala 121, 8 So 98; Brown v. State, supra.

The second basis of Jackson's attack on the validity of his conviction is a claim of error in the instructions. We think this claim is meritorious.

Although we have determined that there is sufficient evidence to support the murder charge as to ▮ Jackson, it appears as a reasonable alternative that Jackson was willing to join Burns in an assault, but he did not contemplate or intend that either of them should use a knife. Murder requires an intent to kill or inflict grievous bodily harm. Since Burns used a knife it may be inferred that he possessed the required intent. But is the intent necessarily imputable to the accused? Article 77 of the Code, 50 USC § 671, does not compel such imputation. On the contrary, the court-martial might have found from the evidence that Jackson had no conscious knowledge Burns was carrying a weapon and that he would be inclined to use it. The court-martial could, therefore, reasonably conclude that Jackson did not share Burns' criminal intent and that his guilt was no greater than that of manslaughter.

See Wharton, Criminal Law, 12th ed, § 258, Note 17, page 345.

In Landrum v. Commonwealth, 123 Ky 472, 96 SW 587, the Kentucky Supreme Court pointed out:

". . . The aider and abettor may be guilty in a different degree from the principal, each to be held to account according to the turpitude of his own motive."

In Red v. State, 39 Tex Crim 667, 47 SW 1003, 1005, the principle was laid down as follows:

". . . If appellant aided or encouraged her, knowing the unlawful intent which possessed her, he may have been guilty of the homicide in the same degree, or he may have been guilty of the homicide in some other degree, according to the intent which actuated him. We hold that the jury should have been properly instructed as to the guilt of Epsy Keith (that is, of what degree of homicide, as suggested by the facts, she may have been guilty, based on her intent), and that then they should have been instructed, as suggested by the facts, of what degree of homicide appellant may have been guilty, predicated upon the intent which may have actuated him."

In State v. McCahill, 72 Iowa 111, 30 NW 553, the defendant was indicted for murder, but convicted of manslaughter. The evidence showed that he was one of a mob of striking miners engaged in forcing new employees to leave their employment. In the course of their efforts, one of the new employees was shot and killed. On appeal, the defendant relied upon the fact that he did not fire the fatal shot and it was not his understanding when he joined the group that anyone would be hurt. In considering whether the trial judge erred in not instructing the jury that it might, on the evidence, return a verdict of guilty of manslaughter, the court said:

"Whether, in case the defendant was not the one who fired the fatal shot, he was guilty of the same *degree* of crime as the one who did, we need not determine. The defendant

**203**

was convicted only of manslaughter. The most which the instruction held was that, if the defendant was engaged in the conspiracy in which the homicide was committed, the act of homicide was binding upon him, the same as if done by himself. By this the court evidently meant that the defendant would not properly escape conviction for the act. The degree of his guilt was a different question, and as to that we need not, under the verdict, express any opinion."

The law officer did not realize the possible limitation on the degree of Jackson's guilt. We all agree that the evidence reasonably raises involuntary manslaughter as a lesser included offense. The failure of the law officer to instruct on the elements of that offense is prejudicial error. United States v. Johnson, 3 USCMA 209, 11 CMR 209. In my opinion, the evidence also raises assault and battery as a lesser included offense. Certainly if Burns' final version of the incident, which is corroborated by some of Jackson's testimony, is believed, Burns did not join Jackson in running after Brueckmann until Jackson was knocked down. Even then he went over merely to see what had happened. It was only after he was struck in the face several times that he took out his knife and stabbed Brueckmann, in purported self-defense. If believed, by the court-martial, this evidence would support a conclusion that Burns acted entirely independently, and that Jackson did not in any way aid or encourage him. See Mitchell v. State, 36 Tex Crim 278, 36 SW 456. However, the view of the majority must prevail. Consequently, we set aside the findings of guilty of unpremeditated murder as to Jackson. We remand his case to The Judge Advocate General of the Army for reference to a board of review. The board of review may, in its discretion, affirm findings of guilty of involuntary manslaughter, and determine a sentence appropriate for that offense, or it may order a rehearing on the charge of unpremeditated murder.

Burns contends that the law officer erred in preventing his counsel from cross-examining a prosecution witness. This witness, the ██ █ Office of Special Investigations agent, testified to the circumstances surrounding the taking of Jackson's first pretrial statement. The witness also took part in the preliminary interrogation of Burns. It is now maintained that since this witness had testified to the manner in which he had advised Jackson of his rights under Article 31, the court might have inferred that Burns was similarly advised. By preventing cross-examination of this witness, Burns contends that he was precluded from weakening this inference. We find no merit in this contention.

Burns took the stand to testify to the circumstances under which he gave his oral statement. By his own admission, he was advised four times of his rights and he told the agent that he understood them. Consequently, we cannot comprehend how any attack on the Jackson interrogation could help Burns.

For the foregoing reasons, the decision of the board of review as to Burns is affirmed.

LATIMER, Judge (concurring in the result):

I concur in the result.

Although the evidence is sufficient to support the offense found by the court-martial, the law officer's failure to instruct on the lesser offense of involuntary manslaughter, which was in issue, requires reversal as to the accused Jackson. However, I believe the board of review may properly affirm a conviction of involuntary manslaughter, or order a rehearing, as to Jackson.

BROSMAN, Judge (concurring in part and dissenting in part):

As I understand the personal views of the Chief Judge, he would require a rehearing as to the accused, Jackson, and would not permit an affirmance of guilt of involuntary manslaughter. Although I agree with much that is said by him, I believe, like Judge Latimer, that this alternative should be open to service authorities here.

The responsibility of the accused,

Burns, for unpremeditated murder is revealed unmistakably by the record of trial—indeed by his own testimony. That of Jackson, however, is much less certain—and this uncertainty possesses two facets: insufficiency of the evidence and instructional error. As to each we are confronted with the necessity for applying the principles having to do with criminal liability as an aider and abettor.

## II

To me three Articles of the Uniform Code appear to be material. Article 77, 50 USC § 671, renders liable as a principal one who "commits an offense punishable by this code, or aids, abets, counsels, commands, or procures its commission." Article 118, 50 USC § 712, characterizes as a murderer one who "unlawfully kills a human being" when he "intends to kill or inflict great bodily harm." Article 119(b), 50 USC § 713, states that an accused person shall be deemed guilty of involuntary manslaughter if he, "without an intent to kill or inflict great bodily harm, unlawfully kills a human being . . . while perpetrating or attempting to perpetrate an offense, other than those specified in paragraph (4) of Article 118, directly affecting the person."

One rationale for the vicarious responsibility of an aider and abettor derives from the law of conspiracy. The well-established rule is that an accused will be held liable for a substantive offense committed by a coconspirator when the criminal act was connected with and in furtherance of the objects of the conspiracy. Pinkerton v. United States, 328 US 640, 90 L ed 1489, 66 S Ct 1180; Nye and Nissen v. United States, 336 US 613, 93 L ed 919, 69 S Ct 766. To my mind, however, the record of trial here fails to disclose the existence of a preconceived agreement between Jackson and Burns whereby they would assault any victim in any degree. Thus, we turn to the more general concept which "makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy." Nye and Nissen v. United States, supra, at page 620.

As this Court has said earlier, an "aider and abettor must share the criminal intent or purpose of the active perpetrator of the crime, and must by his presence aid, encourage, or incite the major actor to commit it." United States v. Jacobs, 1 USCMA 209, 2 CMR 115. Jackson insists that he did not share the purpose of Burns to wield a knife against the deceased, Brueckmann. Undoubtedly, though, he did participate to the hilt in a project looking to the commission of a simple assault on the ultimate victim. By turning to follow the German couple and thereafter pursuing them as they fled, Jackson gave the pair every reason to anticipate that unwelcome force would be applied to their persons if they remained where they were fully entitled to be. Cf. United States v. Smith, 4 USCMA 41, 15 CMR 41. Indeed, Jackson testified that he ran against the deceased when the latter halted suddenly—and, although this bodily contact be regarded as accidental, it would surely constitute a battery within the intendment of military law. See Manual for Courts-Martial, United States, 1951, paragraph 207a.

In United States v. Wooten, 1 USCMA 358, 3 CMR 92, this Court commented that "It is certainly a well-established rule of criminal responsibility that principals are chargeable with results which flow as natural and probable consequences of the offense subjectively intended." While that case was concerned with the criminal liability of one who—by reason of absence at the time of the crime—would at common law have been considered an accessory before the fact rather than an aider and abettor, I find no intimation that the rule is to be limited to the former group of persons.

Numerous legal writers seem agreed in this particular. For instance, Corpus Juris Secundum notes that:

"Where, however, two or more persons acting with a common intent jointly engage in the same undertaking and jointly commit an unlawful act, each is chargeable with liability and responsibility for the acts of all

**205**

the others, each being guilty of the offense committed, to which he has contributed to the same extent as if he were the sole offender. The common purpose need not be to commit the particular crime which is committed; if two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, *but he is also guilty of any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof.* In order to show a community of unlawful purpose it is not necessary to show an express agreement or an understanding between the parties; nor is it necessary that the conspiracy or common purpose shall be shown by positive evidence. . . ." [Emphasis supplied. 22 CJS, Criminal Law, § 87.]

A somewhat parallel pronouncement is the following, found in American Jurisprudence:

"There can be no doubt of the general rule of law that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it and that if he combines and confederates with others to accomplish an illegal purpose, he is liable criminaliter for everything done by his confederates which follows incidentally in the execution of the common design, as one of its probable and natural consequences, even though what was done was not intended as a part of the original design or common plan." [14 Am Jur, Criminal Law, § 80. Compare 26 Am Jur, Homicide, §§ 64, 66.]

And Wharton comments:

"When an intent exists to do wrong, and an unintended illegal act ensues as a natural and probable consequence, the unintended wrong derives its character from the general evil intent." [Wharton, Criminal Law, 12th ed, § 157.]

. . . . .

"All those who assemble themselves

together with an intent to commit a wrongful act, the execution whereof makes probable in the nature of things a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime." [Id. at § 258.]

. . . . .

"While an accessory before the fact (or instigator) is responsible for all crimes incidental to the criminal misconduct he counsels, or which are among its probable consequences, it is otherwise as to collateral crimes not among such incidental and probable consequences." [Id. at § 268.]

Finally, Clark and Marshall's handbook has this to say about the matter:

"It is not always necessary, however, to render one guilty of a crime as a principal in the second degree or accessory before the fact, that he shall have *contemplated* or *expressly* assented to the commission of the particular crime. The general rule is that, if several persons combine or conspire to commit a crime, or if persons command or counsel a crime, or aid and abet in an attempt to commit a crime, or if several engage in an unlawful enterprise, each is responsible as principal in the second degree or accessory before the fact, according to the circumstances, for all acts committed by the others in the execution of the common purpose, if such acts are a natural or probable consequence of the unlawful combination or undertaking." [Clark and Marshall, Law of Crimes, 5th ed, § 183.]

As I analyze this doctrine of vicarious criminal liability, one who participates with another intentionally in a criminal enterprise will be held responsible for the natural and probable consequences of the project entered into. This responsibility does not depend on on a finding by the trier of fact that he *intended* those results. Cf. Manual for Courts-Martial, supra, paragraph 138 *a.* Instead, it hinges solely on a finding that such *were* the natural consequences.

It has already been suggested that

206

Jackson did intend to participate in an assault on the two Germans—and was himself the sole actor in the commission of a battery. He knew, or certainly should have anticipated that Burns—who, like himself, was armed with a knife—would follow. In a sense then, Jackson instigated the conduct of Burns, since both testified that Jackson led in the pursuit of the fleeing Germans—although their testimony differed concerning the extent to which Jackson had outdistanced Burns when the former collided with Brueckmann. Of course—according to their testimony—Jackson hesitated to retrieve his hat, and did not join in the stabbing of the deceased. However, it must be clear that this action on his part did not amount to that affirmative withdrawal required as a prerequisite to an escape from liability for the assault by Burns on the German. Compare Clark and Marshall, supra, § 187; Wharton, supra, § 267; 22 CJS, supra, § 89.

It can be regarded as neither unnatural nor unexpected that a person in Brueckmann's position— pursued as he and his female companion were by two alien soldiers at night in a dark enclosure—would resist to the utmost. Nor can it be considered unforeseeable that his pursuers—both armed with knives—would inflict a serious wound in the ensuing encounter. Thus, as the homicide must be deemed a natural and probable consequence of the joint venture, it follows that Jackson—like Burns—is chargeable in some degree therefor. Indeed, when Article 77 and Article 119(b) are construed conjunctively, it is unmistakable that Jackson, through his own testimony, was liable for involuntary manslaughter at least, because of his aid and abetment in Burns' assault—an offense directly affecting the person of another as a result of which death occurred.

### III

That murder may be made out, however, an intent to kill, or to inflict great bodily harm, is demanded. Will the intent of Burns in that particular necessarily be imputed to Jackson by operation of Article 77? The opinion of this Court in United States v. Jacobs, 1 USCMA 209, 2 CMR 115, quite clearly intimates a negative response to this inquiry. There the accused had been found guilty of larceny, of robbery, and of assault—all by reason of having participated with three other soldiers in an assault against a Japanese National. The victim had been deprived of a purse containing money—but this property had not been found in the accused's possession, but rather in that of another soldier. To the accused's contention that the Government had failed to show that he intended to take any sort of property, and that therefore he could not properly be convicted of larceny and robbery, the Court replied: "Circumstantial evidence may be relied on to establish that one who committed an act in furtherance of a crime, in fact shared a common purpose to accomplish the resulting felony." Significantly, however, we did *not* say that—because of his fellow's design to commit larceny—the absence of an intention to steal on the accused's part would be irrelevant under Article 77.

The implications of that opinion are supported both by the text writers and by judicial decisions. As Wharton points out, the guilt of a principal and that of an accessory may vary in homicide cases according to the motivation of each. Supra, § 276. Another authority indicates that "When a specific intent is necessary to constitute a particular crime, one cannot be a principal in the second degree to that particular offense unless he entertains such an intent." Clark and Marshall, supra, § 169. And American Jurisprudence declares:

". . . According to these rules, the guilt of a principal in the second degree is measured by the intent of the one actually committing the crime, where both have the same intent and purpose; but if the intent of the one who so aids or assists is a different criminal intent, he is guilty according to the intent with which he may have performed his part of the act, notwithstanding this may result in rendering him liable for a graver

**207**

offense." [14 Am Jur, Criminal Law, § 91. See also § 84.]

Similarly, Corpus Juris Secundum announces that:

"Where a particular intent is an element of a felony, it is essential that one aiding and abetting the commission of such offense should have been aware of the existence of such intent in the mind of the actual perpetrator of the felony; but if accused had knowledge of the particular intent on the part of the actual perpetrator of the felony this is sufficient." [22 CJS, Criminal Law, § 87a.]

The cases collected in 12 ALR 275 support the same propositions.

When I apply these principles to offenses denounced by the Uniform Code, I can only conclude that on occasion the liability of a principal may be quite different in degree from that of an aider and abettor. For instance, in homicide prosecutions the principal, if he intentionally kills another without provocation, may be guilty of murder, whereas an aider and abettor, acting in the heat of passion, may be guilty of voluntary manslaughter only—and, of course, vice versa. Similarly, the principal may have premeditated the homicide and thus become criminally liable under Article 118(1) of the Code, although the aider and abettor—depending on his state of mind—may be guilty of no more than unpremeditated murder under Article 118(2)—and again vice versa. A third possible situation is one which possesses materiality in the instant case. The principal may have been moved by a clear purpose to kill the victim, but the aider and abettor may have intended a simple assault alone, and may not have known of the graver intention in the principal's mind. In that event, the principal will be liable for murder in violation of Article 118, but the aider will be held responsible only for involuntary manslaughter as proscribed by Article 119.

IV

It is obvious that the liability of Jackson for involuntary manslaughter

208

was raised by the evidence. Since the law officer supplied no instruction with respect to that alternative, I must concur in a reversal—although I do not agree with the Chief Judge's conclusion that an instruction on simple assault should also have been furnished.

Is the evidence sufficient to support a finding of unpremeditated murder in the event of a rehearing? I have outlined earlier my reasons for believing that the homicide here constituted a natural and probable consequence of the pursuit of the Germans which was initiated by Jackson. Accordingly, I must conclude that the trier of fact in the case at bar could justifiably have inferred that the accused, Jackson, intended the ultimate death of the victim, or at least the infliction of great bodily harm on him. Manual for Courts-Martial, supra paragraph 138a. This inference is the more easily supportable for the reason that Jackson testified to his belief that the German couple had spoken in a derogatory manner of himself and Burns. And the members of the court-martial might well have reasoned that the two soldiers—their judgment impaired by a heavy intake of alcohol—were determined to wreak vengeance on their detractors.

Still another hypothesis, which might conceivably become important on rehearing, runs to the effect that Jackson knew that Burns—although not himself—was determined to inflict serious bodily harm at the least on the Germans—and this knowledge would also suffice to meet the intent requirements of Article 118(2). And so, without reciting more of the evidence before the court-martial here, I must record my conclusion that it furnishes a legally sufficient basis for a finding of guilt of unpremeditated murder as to Jackson—although a subsequent court, when fully instructed on the lesser offense, could with equal propriety find him guilty of no more than involuntary manslaughter as denounced by Article 119.

V

In keeping with these views, I would

remand the record of trial to The Judge Advocate General of the Army for a determination of whether to affirm as to Jackson findings of guilty of involuntary manslaughter, or instead to direct a rehearing on a charge of unpremeditated murder.