UNITED STATES, Appellee

v.

Shawn H. RICHARDS, Private First Class
U.S. Army, Appellant

No. 01-0084

Crim. App. No. 9700809

United States Court of Appeals for the Armed Forces

Argued October 1, 2001

Decided February 6, 2002

CRAWFORD, C.J., delivered the opinion of the Court, in
which GIERKE, EFFRON, and BAKER, JJ., joined.  SULLIVAN, S.J.,
filed an opinion concurring in the result.

Counsel

For Appellant:  Captain Stephanie L. Haines (argued); Colonel
Adele H. Odegard, Lieutenant Colonel David A. Mayfield, Major
Mary M. McCord, and Captain Jimmonique R. S. Rodgers (on brief).

For Appellee:  Captain Steven D. Bryant (argued); Colonel
David L. Hayden, Lieutenant Colonel Edith M. Rob, and Major
Daniel G. Brookhart (on brief); Colonel Steven T. Salata.

Amicus Curiae:  Lisa M. Colone (law student) (argued); Richard
Armstrong and Anne M. Coughlin (supervising attorneys) and
Howard H. Hoege III and Amanda P. Biles (law students) (on
brief) – For the Criminal Justice Program and the Public Service
Center at the University of Virginia School of Law.

Military Judges:  Gregory O. Varo (Trial) and
                  Robert F. Holland (DuBay Hearing)

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

Chief Judge CRAWFORD delivered the opinion of the Court.

Appellant was tried by general court-martial composed of officer and enlisted members and, contrary to his pleas, was found guilty of voluntary manslaughter, in violation of Article 119, UCMJ, 10 USC § 919.  The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to Private E1.  The Army Court of Criminal Appeals affirmed in an unpublished opinion.  We granted review of the following issues:

I.  WHETHER APPELLANT CAN BE HELD CRIMINALLY LIABLE FOR THE STABBING DEATH OF PFC WATERS BY PFC WILSON WHERE THE GOVERNMENT FAILS TO PROVE 1) THAT APPELLANT KNEW OR HAD A REASON TO KNOW PFC WILSON HAD A KNIFE DURING THE FISTFIGHT, 2) THAT APPELLANT'S ACT OF KICKING PFC WATERS AFTER THE FIGHT BEGAN ASSISTED OR INCITED PFC WILSON IN STABBING PFC WATERS OR 3) THAT APPELLANT ENTERED AN AGREEMENT WITH PFC WILSON BEFORE OR DURING THE FISTFIGHT TO STAB PFC WATERS.

II.  WHETHER A STABBING BY A CO-ACCUSED CAN BE CONSIDERED THE NATURAL AND PROBABLE CONSEQUENCE OF AN UNARMED FISTFIGHT INVOLVING MULTIPLE ASSAILANTS WHERE THERE IS NO EVIDENCE APPELLANT KNEW THE CO-ACCUSED WHO COMMITTED THE STABBING HAD A KNIFE, HAD A PROPENSITY TO USE A KNIFE DURING FISTFIGHTS, OR OTHERWISE INTENDED TO STAB THE VICTIM.

III. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE FAILED TO INSTRUCT THE MEMBERS ON THE LESSER-INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER WHEN THERE WAS SUFFICIENT EVIDENCE TO RAISE THE OFFENSE.[1]

---

[1] We heard oral argument in this case at the University of Virginia School of Law, Charlottesville, Virginia, as part of this Court's Project Outreach.  See United States v. Allen, 34 MJ 228, 229 n.1 (CMA 1992).  The University of Virginia School of Law is where we held our first Project Outreach visit on November 13, 1987, in the case of United States v. Sherrod, 26 MJ 30 (CMA 1988).

We hold as to Issues I and II that the evidence is legally sufficient to support appellant's conviction of voluntary manslaughter under an aider and abettor theory, which was the theory under which appellant was tried.  As to Issue III, we hold that the military judge did not err in refusing to instruct on involuntary manslaughter, because that lesser-included offense was not reasonably raised by the evidence.

FACTS

Animosity over a six-month period in 1996 between two groups led to the death of Private First Class (PFC) Dustin Waters.  One group consisted of the victim and PFC Gregory Maxwell.  The other group consisted of appellant, a former soldier named James Morris, PFC Clinton Samuels, and Private E2 Rohan Wilson.  The animosity seems to have fermented out of several isolated events that created a hostile environment between the two groups.  For instance, during the summer of 1996, on two separate occasions, appellant and Maxwell got into an argument because appellant had danced with Maxwell's girlfriend at a club.  On another occasion, on November 2, 1996, appellant and his three friends were at Trooper's nightclub when Morris got into a shoving match with the victim.

The animosity between the two groups came to an unfortunate head on the evening of November 21, 1996.  Appellant and his three friends were spectators at a basketball game at Fort

3

Riley, in which the victim and Maxwell were playing.  After the game, the victim departed the gymnasium before Maxwell and engaged a woman named Ms. Bradley in a conversation.  Maxwell then heard one of appellant's friends say, "That nig*** 'D' [the victim] is talking to that 'B'."  Maxwell was concerned for the victim and went outside and stood beside him.

A few minutes later, the victim and Maxwell got into a car and drove back to their barracks.  Ms. Bradley and a girlfriend followed them in a second car.  Appellant and his friends "hopped in" a third car and followed behind the women.  After the victim, Maxwell, and the women arrived at the barracks parking lot, Maxwell saw appellant and his friends "creeping up" or "driving slowly."  Maxwell then went into the barracks to his room, and the victim stayed behind to talk to Ms. Bradley.  A few minutes later, the victim went into the barracks and asked Maxwell to come outside and talk to the other woman.  Maxwell complied.

Meanwhile, Samuels, who lived in the same barracks as the victim, went into the barracks to have a friend give him a haircut.  Morris testified that at about the same time, he, Wilson, and appellant went into a nearby barracks to visit another friend.  The friend was not there, and they departed the barracks.  Morris went back to the car.  Appellant and Wilson then went to a bank of phone booths about ten to fifteen feet

4

from the front door of the victim's barracks in order for Wilson to return a page and to wait and see "if [the victim] and Maxwell [were] going to say anything or try to do anything."

While the victim and Maxwell were talking to the two women, Morris walked over to the phone booths and asked appellant and Wilson whether the victim or Maxwell had said or done anything. They replied, "No." Morris then went into the victim's barracks to use the latrine. Subsequently, the victim, Maxwell, and the women decided to go into the barracks because it was cold outside. As they walked toward the barracks, they encountered Morris, who walked up to the victim and asked him whether he had had fun the other night. The victim replied, "Yes." Morris then hit the victim with his fist. There remains disagreement as to what else was said between the two.

Appellant and Wilson then balled up their fists and began walking at a fast gait toward the victim from the phone booths. As they approached, appellant and Wilson began hitting their hands with their fists, repeatedly saying, "Yeah, what's up?" At the same time, Maxwell entered the barracks building and encountered Samuels. They "squared off" momentarily, and Maxwell ran upstairs, ostensibly to get help. Meanwhile, Morris and the victim moved to a grassy area next to the barracks. According to Morris, Wilson said, "You'll need to stop." In response, the victim hit Wilson with his fist. Wilson then

5

grappled with the victim while Morris continued to hit him. Morris grabbed the victim from behind and moved him to an open area of the sidewalk because he wanted to get away from any tree or building so no one's punches would miss and hit an object as they tried to hit the victim.

At some point during the beating, Morris and Wilson knocked the victim to the ground and began kicking him. Appellant then joined them, and the three continued to kick the victim. Then Samuels joined the beating, and the four men kicked the victim repeatedly about the body and head. Every time the victim would attempt to get up, he would be kicked back down to the ground. Morris taunted the victim, telling him that he had "messed" with the wrong person and that he should have thought about what he did at the Trooper's club. The four men kicked the victim for about two to ten minutes with their shod feet, stopping only when the charge of quarters came outside and threatened to call the military police.

During the beating, Wilson pulled out a paring knife and stabbed the victim several times. Morris testified that he did not see a knife or know that Wilson was stabbing the victim, but he noticed blood on the sidewalk. After the stabbing, appellant and his friends continued to kick the victim, ending up with blood on their shoes and pants.

6

After appellant and his friends had departed, the victim went back into the barracks holding his chest.  He fell to the floor, and Maxwell noticed that the victim had "a big gash ... in his chest and blood was squirting out of it."  The victim suffered six stab wounds, the fatal one of which pierced his heart.  Dr. Lane testified that the victim would have been able to survive only for five to ten minutes after receiving this wound.

## DISCUSSION

### A. Issues I and II - Legal Sufficiency

Issues I and II ask whether the evidence is legally sufficient to support appellant's conviction for this crime -- that is, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see United States v. Davis, 44 MJ 13, 17-18 (1996).

Although charged with unpremeditated murder, appellant was convicted of the lesser-included offense of voluntary manslaughter.  That crime is defined as the unlawful killing of a human being "in the heat of sudden passion caused by adequate provocation" by someone who does so with "intent to kill or inflict great bodily harm."  Art. 119(a), supra.

As the military judge noted in his discussion of proposed instructions with counsel, "the sole cause of the serious injury and death in this case, based on the testimony of the government's expert, appears to be the knife." There was no evidentiary dispute that the perpetrator of the knife wounds was Wilson, and no disagreement that Wilson had the intent to kill or inflict great bodily harm when he stabbed the victim. The theory of the prosecution, with which the defense took issue and on which the military judge instructed the members, was that appellant's actions had aided and abetted Wilson's killing the victim in the heat of sudden passion caused by adequate provocation. See Art. 77(a)(1), UCMJ, 10 USC § 877(a)(1) (defining a "principal" as an individual who "commits an offense ... or aids, abets, counsels, commands, or procures its commission").

As described by the military judge in his instructions, the critical contested elements were as follows: (1) whether, by kicking the victim, appellant had "aided and abetted Private Wilson in committing the offense of [voluntary manslaughter]"; and (2) whether appellant "either intended to kill or inflict great bodily harm upon [the victim] or ... knew that Private Wilson had such intent." See United States v. Jackson, 6 USCMA 193, 201-02, 19 CMR 319, 327-28 (1955) (aider and abettor theory "requires concert of purpose or the aiding or encouraging of the

8

perpetrator of the offense and a conscious sharing of his criminal intent").

## 1. Aiding and Abetting the Killing by Kicking

With respect to aiding and abetting, we note that this is not an instance of mere presence. See id. at 201, 19 CMR at 327 (mere inactive presence at scene of crime is not aiding and abetting); see also United States v. Thompson, 50 MJ 257, 259 (1999) ("Our case law has generally interpreted Article 77 to require an affirmative step on the part of the accused."). Appellant actively participated, along with his friends, in the assault on the victim. Neither was this a superficial assault. Although the evidence at trial reflects no broken bones or life-threatening injuries to the victim other than the stab wounds, the evidence also demonstrates that this was a serious beating. Appellant's friends knocked the victim to the ground with their fists and began kicking him, and appellant actively joined in the kicking. Appellant and all three of his friends repeatedly kicked him in the head and body for several minutes. Every time the victim tried to arise, he was beaten back down to the ground. This active participation in a beating that so incapacitated the victim and rendered him helpless against the attack is a satisfactory basis upon which a rational factfinder could have found that appellant's kicking aided and abetted

Wilson's killing the felled victim at some point during this assault.

### 2. Appellant's Intent In Aiding and Abetting Wilson

As to appellant's intent to kill or inflict great bodily harm, these same factors provide a legally sufficient basis upon which the members could have inferred that all of the assailants, including appellant, acted with such intent.  Cf. United States v. Martinez, 40 MJ 426, 430 (CMA 1994) ("[F]ists and shod feet used by multiple assailants can constitute a means likely to produce death or grievous bodily harm and entitle the person being attacked to use deadly force.").  He was an active, voluntary perpetrator of the assaultive kicking while the victim was on the ground for a number of minutes.  Appellant voluntarily participated in a chain of events that prevented the victim's escape.  Thompson, supra at 259 (a number of "affirmative step[s]" by the appellant and his cohorts).

It is not necessary that appellant intended that the victim be stabbed or even knew that Wilson had a knife.  Article 119(a) does not require that appellant intended any particular means of inflicting death or great bodily harm but, rather, that he intended the consequence.  Cf. United States v. Foushee, 13 MJ 833, 836 (ACMR 1982) (accused not aider and abettor of assault with intent to commit murder where his intent was limited to assault and battery); United States v. Hofbauer, 2 MJ 922, 926

10

(ACMR 1976) (accused not aider and abettor of aggravated assault where intent was limited to assault and battery). The precise means by which the consequence of death actually was visited (a knife rather than the kicking) does not diminish appellant's culpability for aiding and abetting a criminal assault "with an intent to kill or inflict great bodily harm." Even if appellant did not intend death as a consequence, he can be found guilty of voluntary manslaughter if death in fact resulted and if it resulted from an assault in which he intended great bodily harm. There was ample evidence on this record for the members to conclude that he intended, at a minimum, that the victim suffer great bodily harm.

B. Issue III -- Manslaughter by Culpable Negligence

There was no issue in this case concerning involuntary manslaughter by culpable negligence. When discussing proposed instructions with counsel, the military judge commented: "The Court does not see a basis for an involuntary manslaughter instruction using an aider and abettor theory. It just does not seem to fit based on my look at the evidence." The parties agreed, and so do we.

The medical evidence unequivocally established that the stabbing, not the kicking and beating, caused the victim's death. Accordingly, under the defense's theory of the case, if appellant did not share Wilson's specific intent to kill or

inflict great bodily harm, he was not guilty of murder or involuntary manslaughter.  There is no evidence that appellant's culpable negligence caused the victim's death.  Thus, there was no need for an instruction on involuntary manslaughter because it was not raised by the evidence.

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

SULLIVAN, Senior Judge (concurring in the result):

Appellant was found guilty of the voluntary manslaughter of Private First Class (PFC) Waters, even though another soldier, Private Wilson, actually stabbed PFC Waters to death. Article 119, UCMJ, 10 USC § 919. The military judge instructed the members that they could find appellant guilty of this offense if they found that he had aided and abetted Private Wilson's killing of PFC Waters. Article 77, UCMJ, 10 USC § 877. There is a key issue whether there was legally sufficient evidence admitted in this case showing that appellant aided or abetted Private Wilson's voluntary manslaughter of PFC Waters. See generally Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Appellant initially challenges the legal sufficiency of his conviction on the basis that there was no evidence in this case that he knew the actual perpetrator, Private Wilson, had a knife and intended to stab PFC Waters with that knife. See generally 2 Wayne R. LaFave and Austin W. Scott, Substantive Criminal Law § 6.7 at 136 (1986). He heavily relies on several military cases for this argument. See generally United States v. Jackson, 6 USCMA 193, 203, 19 CMR 319, 329 (1955); see United States v. Foushee, 13 MJ 833, 835 (ACMR 1982); United States v. Hofbauer, 2 MJ 922, 925 (ACMR 1976). He also argues that his guilt as an aider and abettor of Private Wilson required proof that his kicking of PFC Waters assisted or incited Private Wilson in

killing PFC Waters, rather than proof that it simply occurred after the stabbing, as shown in this case.

Article 119(a), UCMJ, states:

> **§ 919.  Art. 119. Manslaughter**
>
> (a)  Any person subject to this chapter who, <u>with an intent to kill or inflict great bodily harm</u>, unlawfully kills a human being in the heat of sudden passion caused by adequate provocation is guilty of voluntary manslaughter and shall be punished as a court-martial may direct.

(Emphasis added.)  On its face, it requires that a perpetrator of this offense have "an intent to kill or inflict great bodily harm" on the alleged victim.

Article 77, UCMJ, defines as a principal to an offense:

> **§ 877.  Art. 77.  Principals**
>
> Any person punishable under this chapter who
>
> (1) commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission; or
>
> (2) causes an act to be done which if directly performed by him would be punishable by this chapter; is a principal.

In <u>United States v. Thompson</u>, 50 MJ 257, 259 (1999), we further stated:

> For an accused to be a principal under Article 77, and thus to be guilty of the offense committed by the perpetrator,

2

> he must (1) "assist, encourage, advise,
> instigate, counsel, command, or procure
> another to commit, or assist, encourage,
> advise, counsel, or command another in the
> commission of the offense"; and (2) "share
> in the criminal purpose [or] design."
> Para. 1b(2)(b), Part IV, Manual for
> Courts-Martial, United States, 1984.

(Emphasis added); see also para. 156, Manual for Courts-Martial, United States, 1969 (Rev. ed.).

In light of the above, the Government was required to show a particular mens rea to find appellant guilty of aiding and abetting the voluntary manslaughter of PFC Waters. In particular, it was required to show:

> (1) Private Wilson intended to kill PFC
> Waters or inflict great bodily harm upon
> him; and
>
> (2) Appellant consciously shared that
> criminal intent.

See United States v. Burroughs, 12 MJ 380, 383 (CMA 1982). Appellant's main argument is that he could not legally share Private Wilson's criminal intent because he did not know Private Wilson had a knife or that he intended to use that knife on PFC Waters. See United States v. Jackson, supra. I must disagree.

Paragraph 1b(4), Part IV, Manual for Courts-Martial, United States (2000 ed.), states:

> (4) Parties whose intent differs from
> the perpetrator's. When an offense
> charged requires proof of a specific
> intent or particular state of mind as an

3

> element, the evidence must prove that the accused had that intent or state of mind, whether the accused is charged as a perpetrator or an "other party" to crime. It is possible for a party to have a state of mind more or less culpable than the perpetrator of the offense. In such a case, the party may be guilty of a more or less serious offense than that committed by the perpetrator. For example, when a homicide is committed, the perpetrator may act in the heat of sudden passion caused by adequate provocation and be guilty of manslaughter, while the party who, without such passion, hands the perpetrator a weapon and encourages the perpetrator to kill the victim, would be guilty of murder. On the other hand, if a party assists a perpetrator in an assault on a person who, known only to the perpetrator, is an officer, the party would be guilty only of assault, while the perpetrator would be guilty of assault on an officer.

(Emphasis added.)

Again, I note that Article 119, UCMJ, requires that the actual perpetrator of voluntary manslaughter have an intent to kill or inflict great bodily harm. Article 77, UCMJ, and our case law required trial counsel to show that appellant had the same intent. Clearly, there is no express legal requirement in military law that forced trial counsel to show appellant knew Private Wilson had a knife or intended to stab PFC Waters with that knife.

4

United States v. Richards, 01-0084/AR

   The D.C. Circuit in United States v. Walker, 99 F.3d 439,
442-43 (D.C. Cir. 1996), has spoken to this intent issue under a
statute quite similar to Article 77, UCMJ.  It said:

> The government's brief, although
> decidedly uncomfortable with and even
> critical of the footnote in North and our
> language in Salamanca, does not clearly
> indicate why appellant's reliance of those
> cases is misplaced.  That seems to be
> because the government reads North and
> Salamanca's use of the phrase "same
> intent" as requiring an intent which is
> "matched"-which would mean that an aider
> and abettor must have exactly the same
> knowledge and disposition as the
> principal.  But that is an overreading; no
> court has ever so held, as it virtually
> would eliminate aider and abettor
> liability.  Appellant, ironically, has it
> right when, in defense of our "same
> intent" language, he points to cases that
> have instead used the term shared intent,
> see, e.g., Nye & Nissen v. United States,
> 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93
> L.Ed. 919 (1949); United States v.
> Martiarena, 955 F.2d 363, 366 (5th Cir.
> 1992); see also United States v. Garrett,
> 720 F.2d 705, 713 (D.C. Cir. 1983), cert.
> denied, 465 U.S. 1037, 104 S.Ct. 1311, 79
> L.Ed.2d 708 (1984); United States v.
> Raper, 676 F.2d 841, 850-51 & n.1 (D.C.
> Cir. 1982), which suggests that the intent
> of the aider and abettor must be shown, in
> crucial respects, to overlap with (but not
> necessarily match) the criminal intent of
> the principal.  For example, in United
> States v. Edmond, 924 F.2d 261, 267 (D.C.
> Cir.), cert. denied, 502 U.S. 838, 112
> S.Ct. 125, 116 L.Ed.2d 92 (1991), we noted
> that if a jury thought an aider and
> abettor had premeditated a murder, but
> enlisted an executioner at the last
> possible moment, a jury "could
> consistently convict the abettor of first-
> degree murder while finding the actual

> perpetrator guilty only of [second-degree murder]."
>
> The <u>North</u> case footnote upon which <u>Salamanca</u> relied, although it used the cryptic and somewhat ambiguous phrase "same intent," must be read as meaning no more than the traditional notion of <u>shared</u> intent because the note explicitly relied on <u>United States v. Sampol</u>, 636 F.2d 621, 676 (D.C. Cir. 1980), and it did not purport to alter the principles we applied there. <u>In Sampol, we had explained that an aider and abettor and a principal must have a "common design or plan," but the aider and abettor "need not perform the substantive offense, need not know its details, and need not even be present."</u> <u>Id</u>. (internal quotation marks and citations omitted). And we explicitly recognized that once a common design is established, the aider and abettor is responsible not only for the success of the common design, but also for the probable and natural consequences that flow from its execution, even if those consequences were not originally intended.

(Emphasis added.)


I agree with a concert of purpose approach to liability of an aider and abettor under Article 77, UCMJ. See <u>United States v. Burroughs</u>, 12 MJ at 380. In my view, the aider and abettor must share the intent of the perpetrator, not the knowledge of his particular means of accomplishing that intent. <u>See</u> para. 1b(4), Part IV, Manual, <u>supra</u>; <u>see also</u> <u>United States v. Searan</u>, 259 F.3d 434, 444 (6th Cir. 2001). This case is not like <u>United States v. Jackson</u>, 6 USCMA at 193, 19 CMR at 319, where evidence was admitted showing the appellant intended to assault the

victim, but he did not intend to kill the victim or inflict great bodily harm upon him.  See also Commonwealth v. Hogan, 396 N.E. 2d 978 (Mass. 1979).  Moreover, this is not a case where the predicate criminal statute violated required proof that a certain type of weapon was used.  See United States v. Spinney, 65 F.3d 231, 236-39 (1st Cir. 1995); United States v. Rosario-Diaz, 202 F.3d 54, 63-64 (1st Cir. 2000).

In sum, Article 77, UCMJ, in my view, requires only that an appellant share a common intent to accomplish the essential elements of the resulting felony.  See United States v. Jacobs, 1 USCMA 209, 211, 2 CMR 115, 117 (1952).  Jackson, Foushee, and Hofbauer apply only where the evidence shows that the perpetrator and the aider and abettor had different criminal intents.  These cases are simply inapplicable where the accomplice's own conduct unequivocally shows his sharing of the perpetrator's intent to kill or grievously harm the victim.

Turning to the actus reus question in this case, evidence was admitted that showed Private Wilson struggled with PFC Waters both before and after appellant joined in the kicking of the victim.  Appellant's conduct in participating in this group assault on PFC Waters could be rationally viewed as providing continued incitement for the killing of PFC Waters by Private Wilson or assisting him in the killing by preventing PFC Waters's

escape and survival after he was stabbed.  I agree with the majority opinion that this evidence was legally sufficient to establish appellant as an aider and abettor.

Moving to the other issues in this case, I conclude Issue II is mooted by my resolution of the first granted issue.  In my view, Private Wilson's multiple uses of a knife in the context of the gang stalking and beating of PFC Waters was clear evidence that he intended to kill or greatly harm PFC Waters.  Moreover, appellant's extended involvement in the stalking and willing participation in this vicious gang beating of PFC Waters was evidence that he shared this criminal design.  In this context, whether the stabbing of PFC Waters was a natural and probable consequence of the kicking of PFC Waters need not be addressed. See generally para. 156, 1969 Manual, supra (delineating a natural or probable consequence liability theory for aiders and abettors where different crime intended by aider and abbettor).

Finally, as to Issue III, I do not find that reversible error occurred as a result of the military judge's failure to instruct on the lesser offense of involuntary manslaughter.  Appellant could be found guilty of this lesser offense if evidence was admitted showing that he only intended to assault the victim, not kill or inflict great bodily harm upon him.  See Article 119(b), UCMJ.  No such evidence was admitted in this case.

8

United States v. Richards, 01-0084/AR

The Government's evidence in this case shows a brutal gang attack on PFC Waters, which appellant actively participated in by kicking the victim. Appellant essentially disputed the Government's proof of his participation in the attack on the basis that it was supported by untrustworthy testimony from the Government's principal witness. There was no evidence suggesting a less dangerous attack was intended by appellant in this case. If the Government's evidence was not accepted by the members, appellant would be found not guilty. In these circumstances, I see no error in the judge's unobjected-to ruling not to give an instruction on involuntary manslaughter in these circumstances. Cf. United States v. Davis, 53 MJ 202, 205-06 (2000); United States v. Wells, 52 MJ 126, 130 (1999)(appellate relief warranted only if appellate court is convinced that the evidence issues are such that a rational jury could acquit on a charged crime and convict on a lesser crime).