Chief Judge CRAWFORD
delivered the opinion of the Court.
Appellant was tried by general court-martial composed of officer and enlisted members and, contrary to his pleas, was found guilty of voluntary manslaughter, in violation of Article 119, UCMJ, 10 USC § 919. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for eight years, forfeiture of all pay and allowances, and reduction to Private El. The Army Court of Criminal Appeals af *283 firmed in an unpublished opinion. We granted review of the following issues:
I. WHETHER APPELLANT CAN BE HELD CRIMINALLY LIABLE FOR THE STABBING DEATH OF PFC WATERS BY PFC WILSON WHERE THE GOVERNMENT FAILS TO PROVE 1) THAT APPELLANT KNEW OR HAD A REASON TO KNOW PFC WILSON HAD A KNIFE DURING THE FISTFIGHT, 2) THAT APPELLANT’S ACT OF KICKING PFC WATERS AFTER THE FIGHT BEGAN ASSISTED OR INCITED PFC WILSON IN STABBING PFC WATERS OR 3) THAT APPELLANT ENTERED AN AGREEMENT WITH PFC WILSON BEFORE OR DURING THE FISTFIGHT TO STAB PFC WATERS.
II. WHETHER A STABBING BY A CO-ACCUSED CAN BE CONSIDERED THE NATURAL AND PROBABLE CONSEQUENCE OF AN UNARMED FISTFIGHT INVOLVING MULTIPLE ASSAILANTS WHERE THERE IS NO EVIDENCE APPELLANT KNEW THE CO-ACCUSED WHO COMMITTED THE STABBING HAD A KNIFE, HAD A PROPENSITY TO USE A KNIFE DURING FISTFIGHTS, OR OTHERWISE INTENDED TO STAB THE VICTIM.
III. WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE FAILED TO INSTRUCT THE MEMBERS ON THE LESSER-INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER WHEN THERE WAS SUFFICIENT EVIDENCE TO RAISE THE OFFENSE.[1]
We hold as to Issues I and II that the evidence is legally sufficient to support appellant’s conviction of voluntary manslaughter under an aider and abettor theory, which was the theory under which appellant was tried. As to Issue III, we hold that the military judge did not err in refusing to instruct on involuntary manslaughter, because that lesser-included offense was not reasonably raised by the evidence.
FACTS
Animosity over a six-month period in 1996 between two groups led to the death of Private First Class (PFC) Dustin Waters. One group consisted of the victim and PFC Gregory Maxwell. The other group consisted of appellant, a former soldier named James Morris, PFC Clinton Samuels, and Private E2 Rohan Wilson. The animosity seems to have fermented out of several isolated events that created a hostile environment between the two groups. For instance, during the summer of 1996, on two separate occasions, appellant and Maxwell got into an argument because appellant had danced with Maxwell’s girlfriend at a club. On another occasion, on November 2, 1996, appellant and his three friends were at Trooper’s nightclub when Morris got into a shoving match with the victim.
The animosity between the two groups came to an unfortunate head on the evening of November 21, 1996. Appellant and his three friends were spectators at a basketball game at Fort Riley, in which the victim and Maxwell were playing. After the game, the victim departed the gymnasium before Maxwell and engaged a woman named Ms. Bradley in a conversation. Maxwell then heard one of appellant’s friends say, “That nig* * * D’ [the victim] is talking to that ‘B’.” Maxwell was concerned for the victim and went outside and stood beside him.
A few minutes later, the victim and Maxwell got into a car and drove back to their barracks. Ms. Bradley and a girlfriend fol *284 lowed them in a second car. Appellant and his Mends “hopped in” a third car and followed behind the women. After the victim, Maxwell, and the women arrived at the barracks parking lot, Maxwell saw appellant and his Mends “creeping up” or “driving slowly.” Maxwell then went into the barracks to his room, and the victim stayed behind to talk to Ms. Bradley. A few minutes later, the victim went into the barracks and asked Maxwell to come outside and talk to the other woman. Maxwell complied.
Meanwhile, Samuels, who lived in the same barracks as the victim, went into the barracks to have a friend give him a haircut. Morris testified that at about the same time, he, Wilson, and appellant went into a nearby barracks to visit another Mend. The Mend was not there, and they departed the barracks. Morris went back to the car. Appellant and Wilson then went to a bank of phone booths about ten to fifteen feet from the front door of the victim’s barracks in order for Wilson to return a page and to wait and see “if [the victim] and Maxwell [were] going to say anything or try to do anything.”
While the victim and Maxwell were talking to the two women, Morris walked over to the phone booths and asked appellant and Wilson whether the victim or Maxwell had said or done anything. They replied, “No.” Morris then went into the victim’s barracks to use the latrine. Subsequently, the victim, Maxwell, and the women decided to go into the barracks because it was cold outside. As they walked toward the barracks, they encountered Morris, who walked up to the victim and asked him whether he had had fun the other night. The victim replied, ‘Yes.” Morris then hit the victim with his fist. There remains disagreement as to what else was said between the two.
Appellant and Wilson then balled up their fists and began walking at a fast gait toward the victim from the phone booths. As they approached, appellant and Wilson began hitting their hands with their fists, repeatedly saying, ‘Yeah, what’s up?” At the same time, Maxwell entered the barracks building and encountered Samuels. They “squared off’ momentarily, and Maxwell ran upstairs, ostensibly to get help. Meanwhile, Morris and the victim moved to a grassy area next to the barracks. According to Morris, Wilson said, “You’ll need to stop.” In response, the victim hit Wilson with his fist. Wilson then grappled with the victim while Morris continued to hit him. Morris grabbed the victim from behind and moved him to an open area of the sidewalk because he wanted to get away from any tree or building so no one’s punches would miss and hit an object as they tried to hit the victim.
At some point during the beating, Morris and Wilson knocked the victim to the ground and began kicking him. Appellant then joined them, and the three continued to kick the victim. Then Samuels joined the beating, and the four men kicked the victim repeatedly about the body and head. Every time the victim would attempt to get up, he would be kicked back down to the ground. Morris taunted the victim, telling him that he had “messed” with the wrong person and that he should have thought about what he did at the Trooper’s club. The four men kicked the victim for about two to ten minutes with their shod feet, stopping only when the charge of quarters came outside and threatened to call the military police.
During the beating, Wilson pulled out a paring knife and stabbed the victim several times. Morris testified that he did not see a knife or know that Wilson was stabbing the victim, but he noticed blood on the sidewalk. After the stabbing, appellant and his Mends continued to kick the victim, ending up with blood on their shoes and pants.
After appellant and his Mends had departed, the victim went back into the barracks holding his chest. He fell to the floor, and Maxwell noticed that the victim had “a big gash ... in his chest and blood was squirting out of it.” The victim suffered six stab wounds, the fatal one of which pierced his heart. Dr. Lane testified that the victim would have been able to survive only for five to ten minutes after receiving this wound.
DISCUSSION
A. Issues I and II — Legal Sufficiency
Issues I and II ask whether the evidence is legally sufficient to support appel *285 lant’s conviction for this crime — that is, “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see United States v. Davis, 44 MJ 13, 17-18 (1996).
Although charged with unpremeditated murder, appellant was convicted of the lesser-included offense of voluntary manslaughter. That crime is defined as the unlawful killing of a human being “in the heat of sudden passion caused by adequate provocation” by someone who does so with “intent to kill or inflict great bodily harm.” Art. 119(a), swpra.
As the military judge noted in his discussion of proposed instructions with counsel, “the sole cause of the serious injury and death in this case, based on the testimony of the government’s expert, appears to be the knife.” There was no evidentiary dispute that the perpetrator of the knife wounds was Wilson, and no disagreement that Wilson had the intent to kill or inflict great bodily harm when he stabbed the victim. The theory of the prosecution, with which the defense took issue and on which the military judge instructed the members, was that appellant’s actions had aided and abetted Wilson’s killing the victim in the heat of sudden passion caused by adequate provocation. See Art. 77(a)(1), UCMJ, 10 USC § 877(a)(1) (defining a “principal” as an individual who “commits an offense ... or aids, abets, counsels, commands, or procures its commission”).
As described by the military judge in his instructions, the critical contested elements were as follows: (1) whether, by kicking the victim, appellant had “aided and abetted Private Wilson in committing the offense of [voluntary manslaughter]”; and (2) whether appellant “either intended to kill or inflict great bodily harm upon [the victim] or ... knew that Private Wilson had such intent.” See United States v. Jackson, 6 USCMA 193, 201-02, 19 CMR 319, 327-28 (1955) (aider and abettor theory “requires concert of purpose or the aiding or encouraging of the perpetrator of the offense and a conscious sharing of his criminal intent”).

1. Aiding and Abetting the Killing by Kicking

With respect to aiding and abetting, we note that this is not an instance of mere presence. See id. at 201, 19 CMR at 327 (mere inactive presence at scene of crime is not aiding and abetting); see also United States v. Thompson, 50 MJ 257, 259 (1999) (“Our case law has generally interpreted Article 77 to require an affirmative step on the part of the accused.”). Appellant actively participated, along with his friends, in the assault on the victim. Neither was this a superficial assault. Although the evidence at trial reflects no broken bones or life-threatening injuries to the victim other than the stab wounds, the evidence also demonstrates that this was a serious beating. Appellant’s friends knocked the victim to the ground with their fists and began kicking him, and appellant actively joined in the kicking. Appellant and all three of his friends repeatedly kicked him in the head and body for several minutes. Every time the victim tried to arise, he was beaten back down to the ground. This active participation in a beating that so incapacitated the victim and rendered him helpless against the attack is a satisfactory basis upon which a rational fact-finder could have found that appellant’s kicking aided and abetted Wilson’s killing the felled victim at some point during this assault.

2. Appellant’s Intent In Aiding and Abetting Wilson

As to appellant’s intent to kill or inflict great bodily harm, these same factors provide a legally sufficient basis upon which the members could have inferred that all of the assailants, including appellant, acted with such intent. Cf. United States v. Martinez, 40 MJ 426, 430 (CMA 1994) (“[F]ists and shod feet used by multiple assailants can constitute a means likely to produce death or grievous bodily harm and entitle the person being attacked to use deadly force.”). He was an active, voluntary perpetrator of the assaultive kicking while the victim was on the ground for a number of minutes. Appellant *286 voluntarily participated in a chain of events that prevented the victim’s escape. Thompson, supra at 259 (a number of “affirmative step[s]” by the appellant and his cohorts).
It is not necessary that appellant intended that the victim be stabbed or even knew that Wilson had a knife. Article 119(a) does not require that appellant intended any particular means of inflicting death or great bodily harm but, rather, that he intended the consequence. Cf. United States v. Foushee, 13 MJ 833, 836 (ACMR 1982) (accused not aider and abettor of assault with intent to commit murder where his intent was limited to assault and battery); United States v. Hofbauer, 2 MJ 922, 926 (ACMR 1976) (accused not aider and abettor of aggravated assault where intent was limited to assault and battery). The precise means by which the consequence of death actually was visited (a knife rather than the kicking) does not diminish appellant’s culpability for aiding and abetting a criminal assault “with an intent to kill or inflict great bodily harm.” Even if appellant did not intend death as a consequence, he can be found guilty of voluntary manslaughter if death in fact resulted and if it resulted from an assault in which he intended great bodily harm. There was ample evidence on this record for the members to conclude that he intended, at a minimum, that the victim suffer great bodily harm.
B. Issue III — Manslaughter by Culpable Negligence
There was no issue in this case concerning involuntary manslaughter by culpable negligence. When discussing proposed instructions with counsel, the military judge commented: “The Court does not see a basis for an involuntary manslaughter instruction using an aider and abettor theory. It just does not seem to fit based on my look at the evidence.” The parties agreed, and so do we.
The medical evidence unequivocally established that the stabbing, not the kicking and beating, caused the victim’s death. Accordingly, under the defense’s theory of the case, if appellant did not share Wilson’s specific intent to kill or inflict great bodily harm, he was not guilty of murder or involuntary manslaughter. There is no evidence that appellant’s culpable negligence caused the victim’s death. Thus, there was no need for an instruction on involuntary manslaughter because it was not raised by the evidence.
DECISION
The decision of the United States Army Court of Criminal Appeals is affirmed.

. We heard oral argument in this case at the University of Virginia School of Law, Charlottesville, Virginia, as part of this Court’s Project Outreach. See United States v. Allen, 34 MJ 228, 229 n. 1 (CMA 1992). The University of Virginia School of Law is where we held our first Project Outreach visit on November 13, 1987, in the case of United States v. Sherrod, 26 MJ 30 (CMA 1988).