**UNITED STATES**

v.

**Airman Anthony J. CLARK, United States Air Force.**

**ACM 34791.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 8 Sept. 2001.

28 June 2004.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Jefferson B. Brown, and Major Jeffrey A. Vires.

Appellate Counsel for the United States: Colonel Anthony P. Dattilo, Lieutenant Colonel Lance B. Sigmon, and Major Eric D. Placke.

Before PRATT, ORR, and GENT, Appellate Military Judges.

OPINION OF THE COURT

GENT, Judge:

A general court-martial composed of a military judge sitting alone found the appellant guilty, pursuant to his pleas, of wrongfully using of methamphetamine, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. The court-martial also convicted the appellant, contrary to his pleas, of disobeying a lawful order, wrongfully using psilocyn, and breaking restriction, in violation of Articles 90, 112a, and 134, UCMJ, 10 U.S.C. §§ 890, 912a, 934. The adjudged and approved sentence was a bad-conduct discharge, confinement for 6 months, forfeiture of $600 pay per month for 6 months, and reduction to E–1. The appellant avers on appeal that it was error for the military judge to release to prosecutors the statements he made to a sanity board. He further argues that the evidence is legally and factually insufficient to sustain his conviction for wrongful use of psilocyn. We agree with his latter claim and take corrective action.

## I. Admission of the Appellant's Statements to Sanity Board

The appellant renews on appeal his assertion that it was error for the military judge to release to trial counsel, and later admit into evidence, the appellant's statements to a sanity board. The appellant acknowledged that Dr. (Major) Karen Peterson, a psychiatrist who testified for the defense, read the sanity board report before testifying. The appellant asserts however, that the government should not have been permitted to review the statements in the sanity report and cross-examine Dr. Peterson about them because they were not first introduced into evidence by the defense. The appellant maintains the military judge's ruling violated his privilege in the statements under Mil. R. Evid. 302.

### A. Facts

On 29 May 2001, the appellant's first sergeant was summoned to take charge of him after he was detained for violating an order not to drive or leave the base. The appellant looked "normal" when he admitted to the first sergeant that he knew it was wrong to leave the base. However, the appellant was hospitalized on 30 May 2001 because his co-workers thought he displayed bizarre behavior. Dr. Peterson treated him from 31 May 2001 until 28 June 2001. She concluded that the appellant suffered a manic episode on 29 and 30 May 2001.

The defense requested a sanity board, pursuant to Rule for Courts–Martial (R.C.M.) 706, to assess the appellant's mental responsibility for the charged offenses. Dr. (Colonel) Gregoria Marrero, a forensic psychiatrist, was the lone member of the sanity board. The appellant told Dr. Marrero that he knew what he was doing during the weekend of 29 and 30 May 2001. He said he left the base numerous times beginning on 27 May 2001. Although the appellant knew he could be punished for leaving the base, he thought that even if he was caught, the worst thing that could happen is "getting out of the military." Dr. Marrero accepted Dr. Peterson's diagnosis of a manic episode, but she concluded that the appellant knew what he was doing on 29 and 30 May 2001, and he knew that it was wrong.

Dr. Marrero also concluded that the appellant could have been malingering on 30 May 2001 when he was hospitalized. She observed that while the appellant's medical records contained evidence to suggest a manic episode, significant aspects of his behavior were not congruent with this diagnosis. Furthermore, the appellant told Dr. Marrero that he was "playing along" with his co-workers and physicians when he discussed grandiose business plans and asserted that he was God. He said he got attention by doing this, and he enjoyed it.

The appellant later obtained the assistance of Dr. Peterson as a confidential consultant. He also notified trial counsel of his intention to raise lack of mental responsibility as a defense. Before the trial, the trial counsel made a motion requesting access to the sanity board report and to the appellant's statements to the board. The military judge denied the motion, ruling it was premature.

At trial, the defense called Dr. Peterson as an expert witness. Dr. Peterson said that she had been asked to formulate an opinion about the appellant's mental state on 29 and 30 May 2001. Dr. Peterson opined that there was a "high likelihood" that the appellant suffered a severe mental disease or defect on 29 and 30 May 2001. She testified that as a result of that defect, the appellant would have had a difficult time appreciating the nature and quality or wrongfulness of his conduct. Dr. Peterson said that this effect was somewhat less on 29 May 2001, because manic episodes build up over time.

During her testimony, Dr. Peterson acknowledged that she had read the sanity board report. After further questioning concerning the extent to which she may have relied upon that report, the trial counsel renewed his request to obtain access to the sanity board report, including the appellant's statements. The military judge granted the motion. Trial counsel used this information to prepare his cross-examination of Dr. Peterson. During cross-examination, Dr. Peterson stated that the appellant admitted to her that he drove off the base on the weekend prior to the events in question. He also gave her the impression that he drove off the

base on the charged dates as well. He said he knew "driving off [the] base was wrong, but [his activities there] held more importance to him."

The trial counsel then called Dr. Marrero as a witness to rebut the testimony of Dr. Peterson. Dr. Marrero testified about statements the appellant made during the sanity board that undermined the appellant's defense of lack of mental responsibility. The military judge found the appellant guilty of offenses that occurred on 29 May 2001 (disobeying a lawful order and breaking restriction), but not guilty of offenses that took place on 30 May 2001 (failure to go and breaking restriction).

### B. Analysis

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. McCollum,* 58 M.J. 323, 335 (C.A.A.F.2003). To find an abuse of discretion requires more than a mere difference of opinion; the challenged ruling must be "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous." *United States v. McElhaney,* 54 M.J. 120, 130 (C.A.A.F.2000), *aff'd,* 55 M.J. 361 (C.A.A.F. 2001) (citing *United States v. Miller,* 46 M.J. 63, 65 (C.A.A.F.1997); *United States v. Travers,* 25 M.J. 61, 62 (C.M.A.1987)). The question of whether a privilege exists is a mixed question of law and fact. *United States v. Napoleon,* 46 M.J. 279, 284 (C.A.A.F.1997); *United States v. Coleman,* 26 M.J. 407, 409 (C.M.A.1988).

■ As we noted earlier, the appellant requested an examination by a sanity board pursuant to R.C.M. 706. This rule permits an inquiry into the mental condition of an accused when it appears that he or she lacked mental responsibility for any charged offense. It authorizes one or more persons to act as a sanity board to conduct an inquiry into the mental responsibility of an accused. R.C.M. 706(c)(1). The board must prepare a report that is provided to the defense counsel and the accused. R.C.M. 706(c)(3). Only the defense or the military judge may disclose to

trial counsel statements an accused made to the board. R.C.M. 706(c)(5).

Mil. R. Evid. 302 governs the admissibility at trial of the sanity board report and statements an accused makes to a sanity board. Mil. R. Evid. 302(a) states, in pertinent part:

(a) *General rule.* The accused has a privilege to prevent any statement made by the accused at a mental examination ordered under R.C.M. 706 and any derivative evidence obtained through use of such a statement from being received into evidence against the accused on the issue of guilt or innocence or during sentencing proceedings.

Because of the absence of a doctor-patient privilege, and a limited psychotherapist-patient privilege in military courts, this rule is designed to allow the accused to put forward a mental responsibility defense by consulting with a government expert, without waiving the right against self-incrimination. Drafter's Analysis, *Manual for Courts–Martial, United States (MCM),* A22–7 (2002 ed.).[1] The rule is intended to protect an accused from the use, by the prosecution, of statements, or evidence derived from his statements, made during a sanity board examination. *MCM,* A22–7. The rule "treats the accused's communication to the sanity board as a form of coerced statement required under a form of testimonial immunity." *MCM,* A22–8.

There is, however, an exception to the general rule in Mil. R. Evid. 302(a). Mil. R. Evid. 302(b)(1) states that, "There is no privilege under this rule when the accused first introduces into evidence such *statements* or *derivative evidence.*" (Emphasis added). Ultimately, the issue before us in this case is whether this exception was triggered. On appeal, the appellant ignores the *derivative evidence* prong of this exception and simply asserts that, because the defense did not first introduce his *statements* to the sanity board, it was improper for the military judge to release those statements to the prosecutors and allow their use in cross-examining Dr. Peterson and examining Dr. Marrero. *See* Mil. R. Evid. 302(c). The government con-

---

1. The 2000 edition of the *Manual* was in effect at the time of the appellant's court-martial. However, the cited portions of the *Manual* are materially the same in the 2002 edition.

cedes that the appellant did not first introduce his *statements,* but contends that the appellant did introduce *derivative evidence* through the testimony of Dr. Peterson, who had been allowed to review the sanity board report and the appellant's statements.

We have scant guidance in determining what constitutes "derivative evidence" within the meaning of Mil. R. Evid. 302, particularly as that term is applied to an accused in Mil. R. Evid. 302(b)(1). In *United States v. Littlehales,* 19 M.J. 512, 515 (A.F.C.M.R.1984), a case involving the potential exclusion of evidence under Mil. R. Evid. 302(a), our Court observed:

> Neither the editorial comment nor the drafter's analysis to Military Rule of Evidence 302 provide any insight as to what constitutes "derivative evidence" beyond suggesting that it might be equated with testimonial immunity, thus making even the "remotest connection" subject to being called "derivative." See S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence,* 63 et seq. (1981).

The Drafter's Analysis of Mil. R. Evid. 302(b)(1) states that the "waiver provision ... applies only when the defense makes explicit use of statements made by the accused to a sanity board or *derivative evidence* thereof. The use of lay testimony to present an insanity defense is *not derivative evidence when the witness has not read the report.*" *MCM,* A22–9 (emphasis added). Implicitly, this language suggests that the converse is true—that a non-sanity board expert who testifies after reading the report *is* offering derivative evidence.

The defense maintains that Dr. Peterson did *not* rely on the sanity board report and statements, contending that Dr. Peterson "in no way based her opinion on information contained in the sanity board report." Unfortunately for the appellant, this assertion is not supported by the record of trial.

During Dr. Peterson's testimony, defense counsel sought to establish that, although she had read the sanity board report, she did not use it in formulating her opinion:

Q. Was there anything else that you used to formulate that opinion?

A. ....I also reviewed the sanity board written by Doctor Morrero [sic].

Q. Now, did you review that prior to formulating your opinion?

A. No and I wouldn't want to. No. I looked at all the other information first then met with him [sic].

Q. So, did you use that as a part of your opinion, to base your opinion on?

A. Not to base my opinion on, I just wanted to see what my colleague—what her findings were. I came to my own conclusion and then I wanted to look at that and see what she had drawn up.

In subsequent questioning by the military judge, Dr. Peterson stated that she had examined the appellant's statements:

Q. Okay. Did Colonel Marrero reference within the report any statements made by Airman Clark?

A. Yes, she did.

Q. Did you read those?

A. Yes.

Q. So you're [sic] overall assessment is based on the following:....

At this point, the military judge referenced a number of items, to include the sanity board report and the appellant's statements to the board. Specifically, the military judge asked her:

Q. You reviewed Colonel Marrero's assessment in the sanity board report to include both narrative and certain statements attributed to Airman Clark?

A. Right.

Dr. Peterson thus acknowledged that each of these played a part in her overall assessment. Finally, the military judge asked:

Q. Aside from your own professional experience, anything else brought to bear upon your ultimate opinion?

A. No. No, Sir.

After this line of questioning, the trial counsel renewed his motion to obtain the sanity board report, including the statements made by the appellant. He also asked to interview Dr. Marrero, to "speak with her fully about her reasoning and her evaluation and determination." Over defense objection, the military judge granted the motion. Al-

though the military judge did not announce findings of fact, it is clear that he granted trial counsel's motion because he concluded that Dr. Peterson relied on the report in formulating her ultimate opinion. After a careful review of Dr. Peterson's testimony, we arrive at the same conclusion. Article 66(c), UCMJ, 10 U.S.C. § 866(c). Although Dr. Peterson testified that she had already formulated her opinion, she also said she then specifically asked to review the sanity board report in order to see the findings of her colleague, Dr. Marrero. We are unwilling to discount the influence of this new material in the calculus of Dr. Peterson's ultimate opinion.

We need not reach the question whether reading alone is sufficient to render subsequent testimony "derivative," because in this case we find not only that the witness read the report, but also that she effectively relied upon it in reaching her ultimate opinion. In this setting, we find that Dr. Peterson's testimony constituted derivative evidence triggering the exception in Mil. R. Evid. 302(b)(1). Accordingly, we hold that the military judge did not abuse his discretion by releasing to the trial counsel the sanity board report and the appellant's statements, allowing the trial counsel to cross-examine Dr. Peterson concerning those statements, and permitting Dr. Marrero to testify about the statements. Mil. R. Evid. 302(c); Mil. R. Evid. 705.

### II. Legal and Factual Sufficiency of Evidence of Wrongful Use of Psilocyn

■ The appellant next challenges the legal and factual sufficiency of the evidence that he wrongfully used psilocyn. Airman (Amn) Kelly Hazen was the appellant's girlfriend at the time he allegedly used psilocyn, an illegal drug contained in certain mushrooms. At the time of trial, Amn Hazen indicated that they were no longer dating, but remained good friends.

Amn Hazen testified that she began drinking alcoholic beverages around 1000 or 1100 in the morning on the day in question. She continued to do so until going to the appellant's room with him at about 1900. Amn Hazen estimated she drank about 24 bottles of beer and 8 small bottles of wine. She frequently drank from a few hours after awakening until she passed out. Amn Hazen testified that, despite having consumed this much alcohol, she would have been able to communicate well with others. However, at the trial, she also testified that she could not recall important aspects of the evening.

Amn Hazen said that although she could not recall any conversations with the appellant from that evening, or the exact words he may have used, she "assumed" the appellant told her about the illegal mushrooms in his room and offered them to her. She made that assumption because that is the only explanation of the events that made sense to her when she tried to recall what happened nearly a year and a half before the trial. She also "assumed" the appellant ate some of the mushrooms, too, because she believed she would not have used them alone. Therefore, before trial, she told others that she used mushrooms "with" the appellant.

The military judge probed the appellant's role in Amn Hazen's use of mushrooms. He asked her:

Q. From somewhere these mushrooms appear, correct?

A. Correct.

Q. How many packages do you see?

A. One.

Q. Where do you see it?

A. I saw it on his desk.

Q. You've told us that the contents of the package were somewhat broken up or crumbly is that correct?

A. Right.

Q. From the time you see this package on the desk, describe for me what happens with it?

A. Well, basically, it wasn't even there for long. I saw it on the desk and then I sort of just opened and took it.

Q. Okay, you open this package and you down it?

A. Right.

Q. Taking it from the desk yourself?

A. Correct.

Q. To your memory, the accused does not touch the package?

A. Correct.

Q. Okay. Do you recall what prompted you to go over to the desk, take the package and swallow the contents?

A. As far as—I mean it was something that I willingly did.

Q. I understand that. I'm just having a tough time picturing you sitting there on the bed, seeing what you describe as dried weeds, on your own going over there and swallowing the things without any type of intervening circumstances. So why do you end up going over there and getting those mushrooms?

A. I just wanted to do them. At that point in my life I seriously didn't care about anything.

Q. I understand. But for some reason, apparently you believed that package contained mushrooms?

A. Yes.

Q. What's the source of your knowledge?

A. Being that he was like the person I was hanging out with, I would have to say the accused.

Q. Okay. Why do you say that?

A. Just because he's the person who I really remember being with on that day.

Q. Okay, but again, I'm trying to make a connection. What source of information do you draw from when you say, I knew they were mushrooms therefore I ate them?

A. I can't remember now.

Q. At the time you identify, from whatever source, this package as mushrooms, go over and consume them, what's the accused doing?

A. I honestly don't remember.

Q. Okay. Do you consume the entire contents of the package?

A. Yes.

Q. Are there other mushrooms in the room that you observe that evening?

A. That I—I didn't seen [sic] any other ones in the room.

Q. Okay. So, all the mushrooms you see in that room that night are consumed by you?

A. Yes.

On further examination, Amn Hazen said she was fairly certain there was a packet of mushrooms in the appellant's room and she consumed it. She said she was less certain of the appellant's conduct that night because, "[W]hen I'm drunk, I'm not concerned about what somebody else is doing. I'm concerned about what I am doing."

Trial defense counsel also probed Amn Hazen's recollection of the appellant's role in her use of mushrooms:

Q. But you—now you testified two different ways. I just want to clear up something as far as, did Amn Clark—do you remember Airman Clark telling you that— or offering you mushrooms?

A. I don't remember any wording or anything like that. And I have a hard time remember [sic] any conversations. Due to what I do remember, it is the thing that makes the most sense.

During further questioning by the military judge, Amn Hazen testified:

Q. Did you tell these folks before that you were certain Airman Clark used mushrooms?

A. Certain on the basis that—

Q. No, just answer my question. Did you tell them that before?

A. I made it clear to them that I was certain based on what I could remember.

The military judge found that the government did not prove beyond a reasonable doubt that the appellant personally performed the act of using psilocyn. Instead, he based his finding upon an application of Article 77, UCMJ, 10 U.S.C. § 877. Article 77, UCMJ, permits a principal—one who aids, abets, counsels, commands, or procures the commission of a crime by another—to be held responsible for the crime. Amn Hazen was the person for whom the appellant allegedly acted as a principal. The appellant argues that the record before us is both legally and factually insufficient to find the appellant guilty of wrongfully using psilocyn by applying Article 77, UCMJ, to the facts of this case. As we explain more fully below, we agree.

### A. Analysis

Article 66(c), UCMJ, requires this Court to conduct a de novo review of the legal and factual sufficiency of the case before us. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F.2002). The test for legal sufficiency requires us to review the evidence in the light most favorable to the government. If any rational trier of fact could have found the elements of the crime beyond a reasonable doubt, the evidence is legally sufficient. *United States v. Richards*, 56 M.J. 282, 285 (C.A.A.F.2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We may affirm a conviction only if we also conclude, as a matter of factual sufficiency, that the evidence proves the appellant's guilt beyond a reasonable doubt. *Washington*, 57 M.J. at 399 (citing *United States v. Sills*, 56 M.J. 239, 240–41 (C.A.A.F. 2002); *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A.1987)). We must assess the evidence in the entire record and take into account the fact that the trial court saw and heard the witnesses. *Id.*

An accused's mere presence at the scene of a crime is not enough for him to be held liable for the criminal conduct of another. *MCM*, Part IV, ¶ 1(b)(3); *Richards*, 56 M.J. at 285 (citing *United States v. Jackson*, 19 C.M.R. 319, 327–28, 1955 WL 3446 (C.M.A. 1955)). If one is not a perpetrator, to be guilty of an offense committed by the perpetrator, one must also "share in the criminal purpose [or] design" while aiding, abetting, counseling, commanding, or procuring the commission of an offense. *Richards*, 56 M.J. at 287. Our superior court has long recognized that mere inactive presence at the scene of a crime is not aiding and abetting. *Jackson*, 19 C.M.R. at 327. Moreover, our superior court has generally interpreted Article 77, UCMJ, to require an affirmative step on the part of the accused. *Richards*, 56 M.J. at 285 (citing *United States v. Thompson*, 50 M.J. 257, 259 (C.A.A.F.1999)).

The government elicited testimony from Amn Hazen that she consumed mushrooms in the appellant's room while he was present, but her memory faltered concerning the appellant's role in this. Even if we assume that Amn Hazen wrongfully consumed mushrooms containing psilocyn, her testimony leaves us unconvinced that the government met its burden to prove beyond a reasonable doubt that the appellant shared a criminal purpose with Amn Hazen. Therefore, the finding on this charge and specification will be set aside.

Having set aside the guilty finding on Charge III, Specification 2, we will reassess the appellant's sentence on the remaining charges of which he was convicted. *United States v. Sales*, 22 M.J. 305 (C.M.A.1986). In *Sales*, our superior court concluded that a court of criminal appeals may reassess a sentence and cure the prejudicial impact of error if the court can determine that, absent the error, "the accused's sentence would have been at least of a certain magnitude." *Id.* at 307. *See also United States v. Doss*, 57 M.J. 182, 186 (C.A.A.F.2002) (Crawford, C.J., concurring in part and dissenting in part) (courts of criminal appeals cannot co-mingle the concepts of sentence reassessment and sentence appropriateness).

In reassessing a sentence, we must be reasonably satisfied that the reassessed sentence is no "higher than that which would have been adjudged absent error." *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000). We accomplish this task by "putting ourselves in the shoes of the sentencing authority" and discerning "the extent of the error's effect on the sentencing authority's decision." *United States v. King*, 50 M.J. 686, 688 (A.F.Ct.Crim.App.1999), *rev'd on other grounds, United States v. Walters*, 57 M.J. 554 (A.F.Ct.Crim.App.2002). "To do so, we [may] only consider the evidence that was [properly] before the sentencing authority at trial." *Id.* After we reassess the sentence, we must consider the entire record and the allied papers to determine whether the sentence is appropriate. *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A.1990).

In light of the record before us, we are confident that the military judge would have imposed a sentence of at least a bad-conduct discharge, confinement for 3 months, forfeiture of $600 pay per month for 3 months, and reduction to E–1. As reassessed, this sentence is one purged of prejudicial error and appropriate for the offenses of which the

appellant now stands convicted. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *Sales,* 22 M.J. at 307.

### III. Conclusion

The finding of guilt for Specification 2 of Charge III is set aside and the specification is dismissed. The findings, as modified, and the sentence, as reassessed, are correct in law and fact and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.

ORR, Judge (concurring in part and dissenting in part):

I concur with the lead opinion as to Issue I. However, after reviewing the record of trial I must respectfully disagree with the majority's conclusion that the evidence was factually and legally insufficient to support the appellant's conviction on Specification 2 of Charge III.

For factual sufficiency, the test for this Court is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325. For legal sufficiency, the test for this Court is whether after reviewing the evidence in the light most favorable to the government, we find that any rational trier of fact could have found essential elements of the crime beyond a reasonable doubt. *Reed,* 54 M.J. at 41. We must "assess the evidence in the entire record without regard to the findings reached by the trial court, and [we] must make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington,* 57 M.J. at 399. In making this assessment, this Court is bound by the "admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Id.* Additionally, it is a familiar principle—often referred to in instructing court members— that they may believe all or any part of a witness' testimony. *United States v. Gran-*

*dy,* 11 M.J. 270, 274 (C.M.A.1981). Using these tests, I would affirm the appellant's conviction for Specification 2 of Charge III.

In the instant case, the appellant was charged with wrongfully using psilocyn. After finding that the government had not proven beyond a reasonable doubt that the appellant actually used psilocyn, the military judge found the appellant guilty as a principal under Article 77, UCMJ. The government's evidence on this specification consisted primarily of the testimony of Amn Hazen. She testified that she consumed an entire baggie of mushrooms that she found on a desk in the appellant's room. She also testified that she was alone at the time with the appellant and that the appellant had a single room.

While the majority opinion is quick to point out that at trial Amn Hazen testified that she could not remember a lot of details about the evening she used the mushrooms, there are several other details that cause me to agree with the findings of the military judge. First, Amn Hazen had a motive to lie because she and the appellant were good friends at the time of the trial. In fact, during the charged time frame, the two were dating and she testified that the appellant is now like a brother to her. She also stated that she spent two hours visiting the appellant the Sunday before his trial started. Even though Amn Hazen stated she was not trying to protect the appellant, she also stated that she did not want to testify.

Second, it appeared that her demeanor at the trial showed her unwillingness to testify truthfully. In reading her testimony, I found at least three unexplained expressions of her demeanor. Before she testified, there is a brief discussion as to whether she wanted water. Later on, the military judge asked the trial counsel to give her tissues. Very early in her testimony, the trial counsel asked the military judge to treat her as a hostile witness. Although the military judge originally denied the trial counsel's request, within a few minutes and without a defense objection, the military judge granted the trial counsel's request to treat Amn Hazen as a hostile witness. A quick reading of the rec-

ord might cause one to believe Amn Hazen was merely answering the trial counsel's questions. However, something about her responses to the trial counsel's questions caused the military judge to conclude otherwise. Ultimately, the military judge resorted to conducting his own questioning. The record of trial provides no explanation as to why the military judge told the trial counsel to give Amn Hazen water and tissues. Additionally, there is no explanation in the record of trial regarding why the military judge granted trial counsel's request to treat Amn Hazen as a hostile witness. However, the actions of the parties seemed to indicate that the military judge's orders were an appropriate response to Amn Hazen's demeanor. After hearing her testimony and observing her demeanor, the military judge concluded that Amn Hazen's version of the events on the evening when she used drugs was not entirely credible. However, the evidence need not be free from all conflict for us to be convinced of an accused's guilt beyond a reasonable doubt. *United States v. Roberts*, 55 M.J. 724, 731 (N.M.Ct.Crim.App.2001), *pet. denied*, 56 M.J. 467 (C.A.A.F 2002). "[F]actfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). In this case, the military judge as the factfinder, believed part of Amn Hazen's testimony while disbelieving another, and found the appellant guilty beyond a reasonable doubt.

Nevertheless, the majority concluded that the government had not met its burden of proof in showing that the appellant aided in Amn Hazen's use of the mushrooms. In order to accept the majority's version of the events, one would have to believe that Amn Hazen does not remember the key events of the evening. Even if she does remember, one would have to believe, that she went with the appellant to his room; she saw a Ziploc bag containing a substance that looked like rotten weeds on his desk; she opened the bag and swallowed the contents. Then Amn Hazen and the appellant left the room and never discussed the contents of the Ziploc bag. Or in the alternative, during the time she or the appellant went to the bathroom, someone came to the appellant's room, left the Ziploc bag, Amn Hazen saw it, and then consumed the contents in the bag. Using common sense and knowledge of the ways of the world, I do not find either of these suggested alternative theories credible.

Amn Hazen's real or contrived memory loss may have been sufficient to convince the military judge that the appellant did not use mushrooms that evening, but her testimony was also sufficient to convince the military judge that the appellant was an aider or abettor. Although Amn Hazen testified she could not remember certain things, she did remember drinking heavily, and that she assumed the appellant told her the contents of the bag were mushrooms. She also remembered ingesting the contents of the bag, and that she did not see anyone other than the appellant in his room that evening. Amn Hazen summed up her testimony best when she said that "pure logic" led her to conclude that the appellant told her the Ziploc bag contained mushrooms.

The military judge had the opportunity to observe Amn Hazen's testimony, demeanor, and assess her credibility. While there may be many reasons why the military judge ordered the trial counsel to give Amn Hazen water and tissues during her testimony and allowed the trial counsel to treat her as a hostile witness, he based these decisions on his personal observations of her demeanor. Additionally, the military judge saw and heard Amn Hazen acknowledge that she was certain that the appellant used mushrooms with her and that she told investigators that the appellant used mushrooms with her. After conducting his own questioning, the military judge concluded that Amn Hazen's assumption that the appellant provided the mushrooms she used was logical. Without seeing the witnesses and hearing their testimony, I am reluctant to conclude this experienced military judge's findings were not rational. After reviewing the record of trial and making allowances for the fact that I did not personally observe the testimony of the witnesses, I am convinced of the appellant's guilt beyond a reasonable doubt. After applying the tests in *Turner, Reed*, and *Washington*, I would affirm the appellant's

conviction of Specification 2 of Charge III. Therefore, I must respectfully dissent.