**UNITED STATES of America**

v.

**Lazzaric T. CALDWELL, Private (E–1), U.S. Marine Corps.**

NMCCA 201000557.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 4 June 2010.

27 Dec. 2011.

Before the Court En Banc.

## PUBLISHED OPINION OF THE COURT

BEAL, Judge:

A military judge sitting as a special court-martial convicted the appellant, pursuant to his pleas, of orders violations, larceny, and wrongful self-injury in violation of Articles 92, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 921, and 934. The military judge also convicted the appellant, contrary to his pleas, of a separate order violation for wrongfully possessing "spice." The convening authority approved the adjudged sentence of confinement for 180 days and a bad-conduct discharge. A panel of this court previously reviewed the case and issued an unpublished opinion. *United States v. Caldwell,* No. 201000557, 2011 WL 5547456, 2011 CC LEXIS 181, unpublished op. (N.M.Ct.Crim.App. 15 Nov. 2011). Upon release of the previous opinion, we *sua sponte* ordered *en banc* reconsideration.

The appellant assigns five errors: 1) the military judge abused his discretion in accepting the appellant's plea to self-injury; 2) the military judge abused his discretion by not ordering a mental examination of the appellant; 3) the evidence is factually insufficient to sustain the conviction for the contested order violation; 4) the military judge abused his discretion in accepting the appellant's plea to larceny; and 5) the appellant did not voluntarily enter into a pretrial agreement. After careful consideration of the record and the parties' pleadings, we find no error materially prejudicial to the appellant's substantial rights has occurred and we affirm the findings and the sentence. Arts. 59(a) and 66(c), UCMJ.

### Self–Injury

■ The appellant was alone in his barracks room, located in Camp Schwab, Okinawa, when he intentionally cut open his wrists with a razor blade, leaving a trail of blood on the barracks floor. Record at 88, 92, 96. At the time of his self-injury, the appellant was in a highly distraught state having just learned that he was being ordered back into

For Appellant: LT Michael Hanzel, JAGC, USN.

For Appellee: Maj William Kirby, USMC; Maj Elizabeth Harvey, USMC.

pretrial confinement.[1] Gunnery Sergeant (GySgt) C, one of the staff noncommissioned officers in the appellant's unit, informed the appellant he was going back to the brig and allowed the appellant the privacy to call his parents from his barracks room before processing the appellant for confinement. Moments later, GySgt C returned to the room and discovered the appellant in his injured state. *Id.* at 92–93, 96. GySgt C administered immediate first aid by wrapping socks around the appellant's wounds and then called for the assistance of corpsmen, who responded with their medical kits. *Id.* at 92–93. After the appellant received acute care for his self-inflicted injuries, he was kept for a day in the base hospital's psychiatric ward for observation before being placed into pretrial confinement. *Id.* at 103.

The undeveloped facts in this guilty plea indicate the self-injury was a genuine suicide attempt which was precipitated by the appellant receiving two pieces of bad news: 1) the death of a close friend who had just returned home after being discharged, and 2) his commanding officer was ordering him back into pretrial confinement. These two events constituted what the appellant considered the "last straw" in a recent series of emotional hardships which ranged from the deaths of several family members to a variety of personal problems the appellant was having in his unit.

Another matter, which may have been a contributing factor leading to the appellant's actions, was the fact that the appellant had been treated for depression, post-traumatic stress disorder, and an unspecified personality disorder. *Id.* at 94–95. Part of his treatment included a prescription to a number of medications, including "Zoloft." *Id.* at 95. According to the appellant, the medications might have been the cause for seizures and brain hemorrhages which caused the appellant to stop taking his medication approximately two weeks before the self-injury. *Id.* Notwithstanding these issues, the appellant disavowed any severe mental disease or defect at the time of his offense. *Id.* at 97–98.

Likewise, the appellant's defense counsel, who had a long-standing relationship with the appellant as he had represented him on other legal assistance and military justice matters, was convinced that an inquiry into the appellant's mental responsibility or capacity was not warranted under RULE FOR COURTS–MARTIAL 706, MANUAL FOR COURTS–MARTIAL, UNITED STATES (2008 ed.). *Id.* at 97.

The assigned error in regard to the self-injury specification seeks relief under the theory that prosecution of a genuine suicide attempt ought to be prohibited under public policy reasons. In our previous opinion, the court found that there was substantial basis in fact to question the plea to self-injury, i.e. there was not a factual basis in the record to support the terminal element.

The appellant pled guilty under both a clause 1 and clause 2 theory of culpability, i.e., that his self-injury was: 1) an act prejudicial to good order and discipline (clause 1) and 2) conduct of a nature to bring discredit upon the armed forces (clause 2). We are satisfied the appellant adequately provided a factual and legal basis that his self-injury was prejudicial to good order and discipline under clause 1 at a minimum. There is no dispute that the appellant intentionally cut both of his wrists with a razor blade. By cutting himself, the appellant caused a disorder in the barracks. He needlessly exposed GySgt C to his bodily fluids and he caused corpsmen to respond with their medical kits, presumably expending medical supplies in the process. Furthermore, the appellant did not go into pretrial confinement as ordered by his commanding officer; instead, he was transported to the hospital where he received acute medical care followed by treatment in the psychiatric ward for one day. The appellant himself stated that the impact of his actions on his fellow Marines was palpable by the way they acted around him after he returned to the unit. Accordingly, we find no substantial basis in law or fact to question the appellant's plea.[2]

---

1. The appellant was previously held in pretrial confinement for 60 days on charges unrelated to this court-martial, which were ultimately disposed of at a summary court-martial.

2. Although not assigned as error, we note that the specification alleging self-injury did not allege the clause 1 or clause 2 terminal element of Article 134. For the reasons cited in *United*

As to the public policy argument, we are not persuaded that criminal prosecution of genuine suicide attempts should be prohibited under military law. As both parties note in their briefs, self-injury has long been a chargeable offense in military jurisprudence. We consider the analyses provided by the Court of Military Appeals in *United States v. Ramsey*, 40 M.J. 71, 75 (C.M.A.1994), and in *United States v. Taylor*, 38 C.M.R. 393, 395, 1968 WL 5427 (C.M.A.1968) dispositive on the matter.

The decision to prosecute what could be viewed as a bona fide suicide attempt is a matter left to the convening authority's unfettered discretion. Conceivably, some instances of self-injury or malingering could be concealed in the guise of a sincere suicide attempt. If a convening authority feels it necessary to resort to court-martial to address this type of a leadership challenge, he or she should be allowed to do so, at least until the executive or legislative branches of government have proscribed this approach by law or regulation.

### Inquiry into the Mental Capacity or Mental Responsibility of the Accused

A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion and questions of law arising from the guilty plea are reviewed *de novo*. *United States v. Riddle*, 67 M.J. 335, 338 (C.A.A.F. 2009) (citations omitted). In light of the public attention paid to the possible link between suicide and certain prescription antidepressants, and considering the fact that the appellant was using this type of medication over a period of time preceding his self-injury, the only aspect about this guilty plea which causes us to pause is whether the military judge abused his discretion by accepting the appellant's pleas without ordering an R.C.M. 706 inquiry. After careful consideration of this record, we find that he did not.

Military appellate courts will only set aside a guilty plea when there is a substantial basis in law or fact to do so. *United States*

*v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). A substantial conflict between the appellant's plea and the evidence of the record is a sufficient basis to set aside the guilty plea. *Riddle*, 67 M.J. at 338. "Should the accused's statements or material in the record indicate a history of mental disease or defect on the part of the accused, the military judge must determine whether that information raises either a conflict with the plea and thus the possibility of a defense or only a 'mere possibility' of conflict." *Id.* (quoting *United States v. Shaw*, 64 M.J. 460, 462 (C.A.A.F.2007)). If the military judge determines the information presented on the record only raises a mere possibility of a conflict, then no further inquiry from the military judge is required. *Id.* The trial judge's determination is a contextual one, which appellate courts review *de novo*. *Id.*

When determining whether the information presented on the record regarding an appellant's mental responsibility or capacity raises a conflict with the plea (as opposed to a mere possibility of a conflict), an appellate court will consider: 1) the appellant's history of mental illness; 2) the appellant's conduct during the providence inquiry and whether it reflected on his capacity to plead guilty; and, 3) if the appellant's statements indicated an inability to appreciate the nature and wrongfulness of his acts. *Id.* at 339. For the following reasons, we conclude that the information contained in the record only raised a mere possibility of a conflict with the plea, thus obviating any further inquiry into the matter.

First, the record before us offers little to no information to disturb the presumption that the appellant was mentally responsible at the time of his misconduct and that he had the mental capacity to stand trial. During the providence inquiry, the appellant informed the military judge that some months before the self-injury, he had been diagnosed with "delayed PTSD as well as personality disorder and depression." Record at 94. The appellant also informed the

*States v. Hackler*, 70 M.J. 624 (N.M.Ct.Crim.App. 2011), we find that this specification reasonably implies all the elements of the offense.

military judge that, during his treatment, he started "to have seizures due to some of the medication, so they took me off of it to see which ones were doing what." *Id.* Following his self-injury, the appellant was brought to the psychiatric ward, where he was observed for a day prior to being placed into pretrial confinement. *Id.* at 103. Approximately six weeks following the incident, the appellant was examined at the neurology department at the Okinawa Naval Hospital for a follow-up appointment related to his seizure disorder. Defense Exhibit L at 1. The notes from that examination reveal the appellant had three seizures from March 2009 to February 2010. *Id.* at 2. The notes also reveal the appellant had a history of several car accidents in which his head had been injured, and also documented a family history of epilepsy. *Id.* at 2–3. The physician's notes do not indicate any issue in regard to the appellant's mental health and concludes the appellant was likely suffering from epilepsy. *Id.* at 3. Neither of the post-trial affidavits provided by the appellant and his trial defense counsel contains any new matter regarding the appellant's mental health. Affidavit of Appellant of 11 Jan 2011; Affidavit of Captain S. Russell Shinn of 6 Jan 2011. Likewise neither affidavit asserts that the appellant is presently laboring under any sort of mental infirmities. Moreover, as the trial defense counsel explained to the military judge, he knew the appellant quite well, having represented him in numerous matters in the past. Record at 97; Affidavit of Capt Shinn at 1–2. Based on his personal observations and contact with the appellant over this prolonged period, trial defense counsel was convinced that there was no issue of the appellant's mental capacity or responsibility and, in his opinion, no need for an R.C.M. 706 examination. Record at 97.

Second, the appellant's statements throughout the providence colloquy with the military judge were oriented, lucid, and articulate. In particular, we note the following colloquy between the military judge and the appellant regarding the appellant's medical care immediately after the incident:

> MJ: ... At the time this occurred, did you go and get proper medical and psychiat-

ric treatment? That's what I wanted to ask.

> ACC: Yes, sir. I went to 3 South for a day.
>
> MJ: For medical and then you went 3 South, which is the—I'm trying to say—excuse me—it's the psychiatric wing of the hospital.
>
> ACC: Yes, sir.
>
> MJ: So you went there and you got proper mental treatment, and again, that's why you feel comfortable being in court today?
>
> ACC: Yes, sir.

*Id.* at 103. In consideration of the whole record, we find that the appellant's conduct reflected that he was well-within his capacity to plead guilty.

Third, the appellant provided a detailed account of the events leading up to and following his misconduct. He openly and freely admitted that he knew what he was doing and could have avoided hurting himself if had wanted to. Nothing in the appellant's colloquy with the military judge indicated the appellant was unable to appreciate the nature and wrongfulness of his acts.

Based upon the foregoing reasons and taking into consideration the assurances of the appellant's counsel, with whom he had a long relationship, we see no substantial basis in law or fact to question this aspect of the appellant's guilty pleas.

**Factual Sufficiency of Spice Conviction**

■ When we review a case for factual sufficiency, we weigh all the evidence of record and, making allowances for not having personally observed the witnesses, determine whether we are satisfied beyond a reasonable doubt of the appellant's guilt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). Having reviewed the testimony of all the witnesses and the photographs admitted into evidence, we are convinced beyond a reasonable doubt from the foil packages found in the appellant's single-occupant barracks room, the tobacco residue in that same trashcan, the observations by the duty personnel of the group in the abandoned chow hall, the physical evidence taken from the chow hall, and the testimony of an investigator with

experience in identifying illicit substances, that the appellant did possess Spice.

## Larceny

■ Under Article 77, UCMJ, 10 U.S.C. § 877, "[a]ny person ... who ... commits an offense ... or aids, abets, counsels, commands, or procures its commission ... is a principal." Even if a person is not the actual perpetrator of an offense, he or she may still be guilty of the offense if they encouraged or instigated another to commit the offense and they shared in the perpetrator's criminal purpose or design. MANUAL FOR COURTS–MARTIAL, UNITED STATES (2008 ed.), Part IV, ¶ 1b(2)(b).

The appellant was charged with the theft of a belt from an Okinawan shopkeeper under the aider and abettor theory. The actual perpetrator of the theft was the appellant's friend, Miko, a female local national with whom the appellant shared an intimate understanding of each other's looks and gestures due to a language barrier between them at the outset of their friendship. Record at 71. The appellant and Miko were shopping together and the appellant handed her a belt which he thought she might want to purchase. *Id.* at 66–67. Instead, Miko told him that she did not have the money for it and she was thinking of just taking it. *Id.* The appellant laughed and watched as she put the belt in her purse. When Miko put the belt in her purse, the appellant knew she was going to steal it, gestured his approval, and then casually walked out of the store, stopping to chat with the shopkeeper. *Id.* at 71. Once Miko emerged from the store with the stolen belt, the appellant laughed again and the two continued on with their shopping excursion. *Id.* at 67.

At trial, the military judge repeatedly informed the appellant that he had to have participated in the theft in some knowing way, that his mere presence was not enough, and that he must have shared Miko's criminal intent. *Id.* at 66–86. The appellant told the military judge that Miko looked to him for approval before taking the belt and that he "gave her the green light" to take the belt by laughing and making gestures when she indicated she might steal it. *Id.* at 71. Fur-

thermore, the appellant told the military judge that Miko would not have taken the belt without his indicating to her that it was "okay." *Id.* at 73, 77. Additionally, the appellant admitted that when he saw Miko put the belt in her purse, that she intended to steal the belt and that he shared in that purpose. *Id.* at 73.

Under the facts of this case, we find: 1) the military judge's explanation of the aider and abettor theory under Article 77, UCMJ, was adequate; 2) the appellant understood Article 77; and 3) the appellant provided a factual basis in support of his plea of guilty to the theft of the belt under the aider and abettor theory. Accordingly, we see no substantial basis to reject the appellant's guilty plea to this offense.

### Coerced Pretrial Agreement

■ The appellant claims that he did not voluntarily enter into a pretrial agreement. He makes this claim notwithstanding his assurance to the military judge that he entered into the agreement freely and without coercion. Record at 113, 129.

If the facts are as the appellant and his counsel allege them to be in their affidavits supporting this assignment of error, then one can conclude that the chain of command might not have done all that it could to support this Marine once he entered pretrial confinement. His family had apparently notified the command of his mother's serious illness, yet the command apparently made little or no effort to help the appellant learn all the details. The appellant had difficulty gaining access to personal funds for authorized hygiene and morale items. The command visited him only sporadically. That possible failure of leadership, however, is a far cry from the "threats, improper harassment, misrepresentation, or 'promises that are by their nature improper'" that will cause us to conclude that the appellant did not voluntarily or intelligently enter into the agreement. *See United States v. Burnell,* 40 M.J. 175, 176 (C.M.A.1994) (quoting *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). We therefore resolve this assignment adversely to the appellant.

### Conclusion

The findings and sentence are affirmed.

Chief Judge REISMEIER, Senior Judge CARBERRY, Judges MODZELEWSKI and Judge WARD concur.

PERLAK, J., filed an opinion concurring in part and dissenting in part, joined by PAYTON–O'BRIEN, J. MAKSYM, S.J., filed a dissenting opinion.

Judge PERLAK, joined by Judge PAYTON–O'BRIEN, (concurring in part and dissenting in part):

I respectfully dissent from so much of the majority opinion as affirms the finding of guilty for the charge and specification under Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921, larceny.

We review a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law arising from the guilty plea *de novo*. If there is a substantial basis in either law or fact for questioning the plea, then we may set aside a finding of guilty based on the plea. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F.2008). Following *United States v. Ferguson*, 68 M.J. 431 (C.A.A.F.2010), *United States v. Care*, 40 C.M.R. 247, 1969 WL 6059 (C.M.A.1969), and Article 45(a), UCMJ, 10 U.S.C. § 845(a), I am left with a substantial basis in both law and fact and would set aside this guilty finding.

The providence inquiry in this case covers approximately 25 pages of transcript for the simple theft of a men's belt from a retail establishment. The inquiry was problematic from the outset, with the appellant informing the military judge that there had been no prior discussion of the larceny and, *inter alia*, upon his realization that the larceny was contemplated by his companion, his actions were apparently laughter, smirking, or other gestures to his non-English-speaking companion, along with the appellant doing nothing to stop the larceny. The ensuing dialogue appropriately gave the military judge pause.

MJ: So you allowed it to happen?

ACC: Yes, sir. That's what I'm saying, I allowed it to happen.

MJ: So I don't understand. Where is your criminal intent to steal the belt then?

ACC: Because once she—once she said that she was going to do it, I had no objections and I just basically went along with it as if I had no problems with it. . . .

Record at 69.

The military judge then converses with the appellant and counsel at some length, in an effort to comport the plea, evidence received so far, and the law of principals, specifically aider and abettor theories. The discussion ultimately leads to some semblance of the appellant having given his companion "permission" or "approval" to commit the larceny, thereby making him a principal to the offense as an aider or abettor. The concept of "permission" or "approval" is enhanced by the following unfortunate application of judicial notice with agreement by the appellant:

MJ: Would you agree to something that's very unique in this case is the fact that—I don't mean to generalize here, but Japanese women seem to me to be very submissive and kind of take their cues from the male population. Would you agree with that or not?

ACC: I—would agree, sir.

*Id.* at 79.

The military judge erred in his application of the law of principals in this case. The appellant was no more and no less an aider or abettor based on the assumed socialization traits of his putative co-perpetrator. The providence inquiry establishes that the appellant never counseled his companion to commit this offense, did not share in the common criminal intent with her at the time of the offense, and did not function as a lookout. He exited the shop ahead of his companion, not knowing for certain that she would persist in her larceny. The appellant had no duty to stop the offense or otherwise report it to the shopkeeper. His presence at the scene and nebulous actions in this case are insufficient to impose criminal liability upon him for another's offense. While the appel-

lant maintained during the providence inquiry that his laughter or other non-verbal intimations of approval constituted "permission" to steal the item, we and the law must differentiate between active encouragement, acquiescence or some flavor of knowing indifference. "The law of aider and abettor is not a dragnet theory of complicity.... Neither does later approval of the act supply a ground for conviction." *United States v. Jackson,* 19 C.M.R. 319, 327, 1955 WL 3446 (C.M.A.1955) (citations omitted).

On the state of this record, I am left with a substantial basis in both law and fact for questioning this plea and therefore would set aside the larceny conviction. *See Inabinette,* 66 M.J. at 322. However, I otherwise concur in the majority opinion on the remaining findings. I also concur in affirming the sentence, upon reassessment, following my determination that the landscape would not change dramatically upon the setting aside a shoplifting-type offense involving $100.00. *See United States v. Buber,* 62 M.J. 476, 479 (C.A.A.F.2006) (citing *United States v. Riley,* 58 M.J. 305, 312 (C.A.A.F.2003)).

MAKSYM, Senior Judge (dissenting):

I dissent. Notwithstanding a renewed view of this matter *en banc,* I cannot bring myself to join my colleagues as I remain firmly convinced by this record that the trial judge was in no position to accept pleas of any kind in this matter prior to a board being convened under RULE FOR COURTS-MARTIAL 706, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2008 ed.) and a certification of competence and mental responsibility having been tendered to the court below.

The facts, to the degree that they are cultivated within the record, are most troubling. The appellant was suffering from brain seizures, a personality disorder of some magnitude, depression, and post-traumatic stress disorder (PTSD), the severity and genesis of which also lacks explanation. Record at 94; Defense Exhibit L. These disorders commanded the attention of a mental health specialist who had prescribed the antidepressant Zoloft and two additional medications not identified within the record.

Record at 95; Defense Exhibit L. The appellant rather than any medical authority terminated the use of one or more of these medications sometime prior to the commission of the offenses at bar. Record at 95. Moreover, before us lays a record in which the appellant asserts, without rejoinder from the United States, that his command would not visit him whilst in confinement—in stark contravention of regulation and would not facilitate his acquisition of permissible financial means so as to make contact with his dying mother while confined. Affidavit of Appellant of 11 Jan 2011; Affidavit of Captain S. Russell Shinn of 6 Jan 2011. With those facts as a backdrop, we engage the merits of the litigation.

For reasons not made clear within the record before us, the trial judge did not seek evaluation of the appellant by a board convened under R.C.M. 706. Rather, he deferred to the detailed defense counsel for an informal evaluation of the appellant's state of mind. Record at 97–99. The record clearly betrays that the military judge was aware that the appellant had been or was being treated for PTSD, depression, and an unspecified personality disorder along with seizures, but he failed to garner additional facts as to the cause or severity of same, or the efficacy of the prescribed and sometimes-not-taken medications, through the review of appellant's medical record or the calling of his medical providers. *Id.* at 94–95.

There is no question that the trial judge recognized that the issues of mental competency and mental responsibility had at least been raised by the commentary of the appellant during the providence inquiry. Indeed, it was the military judge, not the detailed defense counsel, who raised the issues of competency and mental responsibility after the appellant had offered an outline of his past mental health related difficulties. *Id.* at 97. However, rather than pursuing the matter via extra-record materials, such as the appellant's medical record or through the taking of testimony, the judge's concern was seemingly satiated by the endorsement of detailed defense counsel who stated the following:

Sir, Private Caldwell and I have known each other for quite some time and through my interactions with him, well, I think that he was in a very depressed state at the time of the incident. Through our conversations, I believe that he knew what he was doing and that point, and he knew that what he was doing was wrong. And also that at present he has the ability to understand our conversations and to adequately defend himself, sir.

*Id.* at 97. The appellant then attempted to bolster his counsel's endorsement by immediately adding the following:

Sir, it wasn't to the fact that I didn't know what was going on. It was just that over the time, while in the unit there were a lot of situations that had arisen that I felt were kind of hard to deal with at the time. But it wasn't that I went temporarily insane or anything of that nature. *I just was putting on a show for everyone just making it seem like I was okay, but there was only those few people that I would let know that, okay, there really is something wrong. There was something bad.* But they didn't know how to—how to really treat it. And then *whenever they actually did get really worried, I would make them feel as if no, no, it's okay, it's okay.* And then it was just over the year from being stabbed by the ex-fiancee, then great grandmother passed, my grandma passed and my friend passed and all the other things at the unit as far as some trouble, some not trouble, just too many things at that point in time, and I just felt that I made a conscious decision at that time that I did not want to live at that time. *And it was an attempt to try to kill myself,* but it wasn't just temporary insanity, sir.

*Id.* at 97–98 (emphasis added). Rather than delve further into the factual basis behind the appellant's comments related to his mental health, the military judge simply articulated the following policy:

[T]his court is not a court that immediately upon hearing anything to do with some sort of mental problem stops the proceedings—I am just putting this for the record—and indicates everyone has to have a 706 hearing. I don't believe that that's

required, and I don't believe it's necessary. But it is necessary that I understand and that I believe that you were not suffering from some sort of mental disease or defect at the time, that you understood the nature and course of your action, and that you were committing a wrongful or illegal act, and that you explain that to me. And then, of course, that you can participate in your defense here in trial. And I think Captain Shinn spoke to all those issues. You heard him speak that.

*Id.* at 98–99.

Detailed defense counsel should request, and a military judge should order, even in the absence of such a request, a hearing pursuant to R.C.M. 706 if it appears "that there is reason to believe that the accused lacked mental responsibility for any offense charged or lacks capacity to stand trial ...." R.C.M. 706(a). While trial defense counsel offered assurances that he personally believed that the appellant was competent and responsible, the appellant's statements that he was fooling people into thinking his problems were not that significant can only cause one to wonder whether counsel—and the military judge—were just two of the people for whom he was *"just was putting on a show ... just making it seem like I was okay."* Accordingly, I would hold that where a military judge identified the diagnoses of PTSD (the nature and effect of which are not described by any evidence), an unspecified personality disorder, seizure activity, the proscription of an anti-depressant and two other unidentified mental health related medications, along with an actual suicide attempt, there exists no possible alternative other than to order a hearing pursuant to R.C.M. 706. *See United States v. Zaruba*, No. 201000382, 2011 WL 696865, at *3 n. 5, 2011 CCA LEXIS 27, at *9 n. 5, unpublished op. (N.M.Ct.Crim.App. 28 Feb. 2011) (setting aside a guilty plea conviction where "[t]here was no evidence to suggest that the military judge was aware of the existence of any Rule for Court–Martial 706 board report" and the military judge failed to conduct an adequate providence inquiry after learning that the accused may have suffered from PTSD and bi-polar disorder).

In the absence of some evidence or testimony to clarify the nature and effect of the appellant's multiple psychiatric/ psychological maladies, and the medication prescribed for them, I cannot have confidence that the appellant could providently plead to any offense, let alone the self-injury and larceny offenses which stand dependent upon the formulation of specific intent. I am of the opinion that the trial judge could not accept the appellant's pleas because there existed a substantial basis to question them. I therefore cannot affirm any conviction in this matter. I would remand the matter for a hearing pursuant to R.C.M. 706 and dispose of the matter dependent upon a report from that hearing. I respectfully dissent.